

**17 MAG 3408**

Approved: _____

ROBERT ALLEN
Assistant United States Attorney

Before:  HONORABLE SARAH NETBURN
         United States Magistrate Judge
         Southern District of New York

- - - - - - - - - - - - - - - -   x
                                   :
UNITED STATES OF AMERICA           :     **SEALED COMPLAINT**
                                   :
        - v. -                     :     Violations of 15 U.S.C. §§
                                   :     78j(b) & 78ff; 17 C.F.R.
WALTER C. LITTLE,                  :     § 240.10b-5; 18 U.S.C. §§
        a/k/a "Chet," and          :     371 and 2.
ANDREW M. BERKE,                   :
                                   :     COUNTY OF OFFENSES:
        Defendants.                :     New York
                                   :
- - - - - - - - - - - - - - - -   x

SOUTHERN DISTRICT OF NEW YORK, ss.:

        BEMPSEY G. CO, being duly sworn, deposes and says that he
is a Special Agent with the Federal Bureau of Investigation
("FBI") and charges as follows:

### COUNT ONE
### (Conspiracy to Commit Securities Fraud)

        1.   From at least in or about February 2015 through in or
about May 2016, in the Southern District of New York and
elsewhere, WALTER C. LITTLE, a/k/a "Chet," and ANDREW M. BERKE,
the defendants, and others known and unknown, willfully and
knowingly did combine, conspire, confederate, and agree together
and with each other to commit offenses against the United
States, to wit, securities fraud, in violation of Title 15,
United States Code, Sections 78j(b) and 78ff and Title 17, Code
of Federal Regulations, Section 240.10b-5.

        2.   It was a part and object of the conspiracy that WALTER
C. LITTLE, a/k/a "Chet," and ANDREW M. BERKE, the defendants,
and others known and unknown, willfully and knowingly, directly
and indirectly, by use of the means and instrumentalities of
interstate commerce, and of the mails, would and did use and
employ manipulative and deceptive devices and contrivances in

1

connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (1) employing devices, schemes and artifices to defraud; (2) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (3) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

<u>Overt Acts</u>

3.   In furtherance of the conspiracy and to effect its illegal object, WALTER C. LITTLE, a/k/a "Chet," and ANDREW M. BERKE, the defendants, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.   In or about February 2016, LITTLE executed profitable trades in Hanger, Inc. ("Hanger") securities after having misappropriated material, non-public information regarding a delisting of Hanger's shares (the "Hanger MNPI") from the law firm at which he worked ("Firm-1").

b.   In or about February 2016, LITTLE provided the Hanger MNPI to BERKE.

c.   In or about February 2016, BERKE executed trades in Hanger securities based in part on the Hanger MNPI that BERKE had acquired from LITTLE, which trades cleared through the Southern District of New York.

d.   Between in or about May 2015 and July 2015, LITTLE executed profitable trades in Magnetek, Inc. ("Magnetek") securities after having misappropriated from Firm-1 material, non-public information regarding Magnetek's pending acquisition by Columbus McKinnon Corporation (the "Magnetek MNPI").

e.   Between in or about May 2015 and July 2015, LITTLE provided the Magnetek MNPI to BERKE.

f.   Between in or about May 2015 and July 2015, BERKE executed profitable trades in Magnetek securities based in part on the Magnetek MNPI that BERKE had acquired from LITTLE, which trades cleared through the Southern District of New York.

g.    Between in or about June 2015 and August 2015, LITTLE executed profitable trades in Pentair plc ("Pentair") securities after having misappropriated from Firm-1 material, non-public information regarding Pentair's earnings and pending acquisition of another company (the "Pentair MNPI").

h.    Between in or about June 2015 and August 2015, LITTLE provided the Pentair MNPI to BERKE.

i.    Between in or about June 2015 and August 2015, BERKE executed profitable trades in Pentair securities based in part on the Pentair MNPI that BERKE had acquired from LITTLE, which trades cleared through the Southern District of New York.

j.    Between in or about January 2015 and May 2016, LITTLE executed profitable trades in Whiting Petroleum Corp. ("Whiting") securities after having misappropriated from Firm-1 material, non-public information regarding Whiting's earnings and a pending securities offering (the "Whiting MNPI").

k.    Between in or about January 2015 and May 2016, LITTLE provided the Whiting MNPI to BERKE.

l.    Between in or about January 2015 and May 2016, BERKE executed profitable trades in Pentair securities based in part on the Whiting MNPI that BERKE had acquired from LITTLE, which trades cleared through the Southern District of New York.

(Title 18, United States Code, Section 371.)

## COUNTS TWO THROUGH SEVEN
### (Securities Fraud)

4.    On or about the dates set forth below, in the Southern District of New York and elsewhere, WALTER C. LITTLE, a/k/a "Chet," and ANDREW M. BERKE, the defendants, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails and the facilities of national securities exchanges, in connection with the purchase and sale of securities, used and employed manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2, by: (a) employing evidences, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which

3

operated and would operate as a fraud and deceit upon persons,
to wit, on the basis of material, non-public information that
LITTLE obtained through his employment at Firm-1 and disclosed
to BERKE in violation of his duties to Firm-1, and in exchange
for benefits that BERKE provided to LITTLE, LITTLE and BERKE
executed and caused to be executed the securities transactions
listed below:

| Count | Date | Transaction |
|-------|------|-------------|
| 2 | In or about February 2016 | Purchase of put options in Hanger stock |
| 3 | Between in or about May 2015 and July 2015 | Purchase of shares of Magnetek stock |
| 4 | In or about August 2015 | Purchase of call options for Pentair stock |
| 5 | In or about February 2015 | Purchase of put options for Whiting stock |
| 6 | In or about March 2015 | Purchase of put options for Whiting stock |
| 7 | In or about July 2015 | Purchase of put options for Whiting stock |

(Title 15, United States Code, Sections 78j(b) & 78ff;
Title 17, Code of Federal Regulations, Sections 240.10b-5 and
240.10b5-2; and Title 18, United States Code, Section 2.)

## COUNTS EIGHT THROUGH TWELVE
### (Securities Fraud)

    5.    On or about the dates set forth below, in the Southern
District of New York and elsewhere, WALTER C. LITTLE, a/k/a
"Chet," the defendant, willfully and knowingly, directly and
indirectly, by use of the means and instrumentalities of
interstate commerce, and of the mails and the facilities of
national securities exchanges, in connection with the purchase
and sale of securities, used and employed manipulative and
deceptive devices and contrivances, in violation of Title 17,
Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2,
by: (a) employing evidences, schemes, and artifices to defraud;
(b) making untrue statements of material fact and omitting to
state material facts necessary in order to make the statements
made, in the light of the circumstances under which they were
made, not misleading; and (c) engaging in acts, practices, and
courses of business which operated and would operate as a fraud
and deceit upon persons, to wit, on the basis of material, non-
public information that LITTLE obtained through his employment

4

at Firm-1, LITTLE executed and caused to be executed the
securities transactions listed below:

| Count | Date | Transaction |
|-------|------|-------------|
| 8 | In or about July 2015 | Purchase of put Douglas Dynamics, Inc. stock |
| 9 | In or about July 2015 | Purchase of put options for Pentair stock |
| 10 | In or about July 2015 | Purchase of put options for Oshkosh Corp. stock |
| 11 | In or about April 2015 | Purchase of put options for Harley Davidson, Inc. stock |
| 12 | In or about October 2015 | Purchase of put options for Whiting stock |

(Title 15, United States Code, Sections 78j(b) & 78ff;
Title 17, Code of Federal Regulations, Sections 240.10b5 and
240.10b5-2; and Title 18, United States Code, Section 2.)

The bases for my knowledge and the foregoing charges are,
in part, as follows:

6.    I am currently employed as a Special Agent with the
FBI and have been for approximately 13 years.  I am currently
assigned to a squad responsible for investigating violations of
the federal securities laws and related offenses, including
insider trading.  I have participated in investigations of such
offenses, and have made and participated in arrests of
individuals who have committed such offense.

7.    The information contained in this affidavit is based
upon my personal knowledge, as well as information obtained
during this investigation, directly or indirectly, from other
sources and agents, including documents and information provided
to me by representatives of Firm-1 and the U.S. Securities and
Exchange Commission ("SEC"), documents provided by financial
institutions, and other business records.  Because this
affidavit is prepared for the limited purpose of establishing
probable cause, I have not set forth each and every fact I have
learned in connection with this investigation.  Where
communications and events are referred to herein, moreover, they
are related in substance and in part.  Where dates, figures, and
calculations are set forth herein, they are approximate.

RELEVANT ENTITIES

8.   At all times relevant to this Complaint:

a.   Firm-1 was an international law firm with offices located around the world.  Firm-1 serviced numerous clients on various transactional and litigation matters.  In connection with its business, Firm-1 was in possession of material, non-public information regarding its clients, such as draft SEC filings, earning announcements, and materials relating to pending mergers and acquisitions.

b.   WALTER C. LITTLE, a/k/a "Chet," the defendant, was hired by Firm-1 as an attorney in or about October 2005.

c.   ANDREW M. BERKE, the defendant, is a friend and business associate of LITTLE.

d.   Hanger was a publicly traded medical company headquartered in Austin, Texas.  Hanger's shares traded on the New York Stock Exchange ("NYSE") under the symbol "HGR" until they were delisted on or about February 29, 2016, after which point Hanger's shares traded over the counter.

e.   Magnetek was a publicly traded technology company headquartered in Menomonee Falls, Wisconsin.  Magnetek shares traded on the Nasdaq Stock Market under the symbol "MAG" until on or about September 2, 2015, when it was acquired by Columbus McKinnon Corporation ("Columbus McKinnon").

f.   Douglas Dynamics, Inc. ("Douglas Dynamics") was a publicly traded manufacturer of vehicle attachments and equipment headquartered in Milwaukee, Wisconsin.  Douglas Dynamics's shares traded on the NYSE under the symbol "PLOW."

g.   Pentair was a publicly traded multinational diversified company with offices located in, among other places, Ireland and the United Kingdom.  Pentair's shares were traded on the NYSE under the symbol "PNR."  In or about August 2015, Pentair announced that it would acquire ERICO Global Company.

h.   Oshkosh Corp. ("Oshkosh") was a publicly traded industrial company that designed and built specialty vehicles. Oshkosh was headquartered in Oshkosh, Wisconsin.  Its shares traded on the NYSE under the symbol "OSK."

i.   Harley Davidson, Inc. ("Harley") was a publicly traded motorcycle manufacturer headquartered in Milwaukee,

Wisconsin. Harley's shares were traded on the NYSE under the symbol "HOG."

j.     Whiting was a publicly traded oil and gas exploration and production company headquartered in Denver, Colorado. Whiting's shares were traded on the NYSE under the symbol "WLL."

## SUMMARY OF THE INSIDER TRADING SCHEME

9.     As set forth below, there is probable cause to believe that WALTER C. LITTLE, a/k/a "Chet," the defendant, used material, non-public information that he misappropriated through his employment at Firm-1 to make profitable securities trades, and that he tipped such information to ANDREW M. BERKE, the defendant, who in turn also used such information to make profitable securities trades. Specifically:

a.     As a partner at Firm-1, LITTLE had access to Firm-1's document management system. Firm-1's document management system contained, among other things, documents containing material non-public information regarding Firm-1's clients, such as draft earnings reports and documents relating to pending mergers and acquisitions.

b.     In violation of Firm-1's employee policies and in breach of his duties to Firm-1 and its clients, LITTLE accessed material non-public information entrusted to Firm-1 by multiple clients including Hanger, Magnetek, Douglas Dynamics, Pentair, Oshkosh, Harley Davidson, and Whiting Petroleum. LITTLE accessed these documents and information, moreover, even though he billed no time to these clients.

c.     After accessing advance information regarding the above-referenced entities' earning and merger announcements, for example, LITTLE commonly placed profitable trades in securities and passed the misappropriated information to BERKE, who, like LITTLE, placed profitable trades, sometimes within minutes of receiving the information from LITTLE.

d.     LITTLE and BERKE made approximately $327,252 and $668,537, respectively, by trading on material non-public information LITTLE misappropriated from Firm-1.

## LITTLE'S EMPLOYMENT AT FIRM-1

10.     Based in part on my review of records provided by Firm-1, I have learned the following, in substance and in part:

a.    At all times relevant to this Complaint, Firm-1 employees were subject to a "Policy on Confidentiality" requiring them to keep certain client information confidential. This policy provided in part as follows:

> The rules of professional responsibility impose upon lawyers and law firm personnel a duty to preserve and protect confidential client information.  Under those rules, confidential client information includes not only information protected by the attorney-client privilege, but all other information relating to the representation of current and former clients, whatever its source.  Client information can also include information received from a prospective client discussing possible representation, even if that person or entity does not become a client....

> Therefore, all partners and personnel of the Firm must maintain the confidentiality of information obtained about the Firm's clients.... Disclosure of this information, either within or outside the Firm, can be very harmful to our clients, our business interests, and to individual partners or personnel.  Such disclosure will be treated very seriously, including possible termination.  All partners and Firm personnel are expected to abide by this Policy, even after they have left the partnership or the employment of the Firm.

Firm-1's "Policy on Confidentiality" also stated that Firm-1's "internal records are often extremely confidential" and provided that "Individuals are prohibited from searching for or accessing sensitive or confidential information in Firm Systems without a legitimate business reason."

b.    At all times relevant to this Complaint, Firm-1 employees were also subject to a "Policy on Material Nonpublic Information Relating to Companies And/Or Securities."  This policy further prohibited the use and dissemination of certain client information.  This policy provided, in part:

> In performing legal and related services for clients, Firm attorneys and other Firm Personnel will acquire nonpublic (that is, not yet disseminated to the general public) information concerning both Firm clients and third parties, and such information may be

material (that is, it may be significant enough to affect the decision of a person to buy or sell securities of such entities)....

Confidential information may cover a broad range of topics, including pending litigation or changes in status of litigation; proposed tender offers, mergers or acquisitions or dispositions of assets; intellectual property and the validity and scope of patents, major contracts, government investigations; or pending changes in corporate policy (such as dividend increases or stock splits). Obviously this listing is not intended to be exhaustive.

... It is the policy of the Firm that no Firm partner, associate or other employee shall (1) buy or sell securities when that person is in possession of material nonpublic information respecting the securities or the issuer or (2) disclose any such information to any other person except to the extent necessary to carry out the Firm's legal and professional responsibilities.

Firm-1's "Policy on Material Nonpublic Information Relating to Companies And/Or Securities" also specifically noted that "an attorney trading in securities for personal profit on the basis of nonpublic information may be held liable for violating ... the Securities Exchange Act of 1934."

       c.    At all times relevant to this Complaint, Firm-1 required its employees to acknowledge that they had read and were in compliance with certain Firm-1 policies, including its "Policy on Confidentiality" and "Policy on Material Nonpublic Information Relating to Companies And/Or Securities," on an annual basis. WALTER C. LITTLE, a/k/a "Chet," the defendant, certified his compliance with these policies during each year of his employment at Firm-1. On or about March 18, 2013, February 26, 2014, and March 23, 2015, for example, LITTLE certified that "ha[d] read, understand, and will comply fully with" Firm-1's "Policy on Confidentiality" and "Policy on Material Nonpublic Information Relating to Companies And/Or Securities." LITTLE was provided with a summary of these policies, moreover, when making these certifications.

       d.    At all times relevant to this Complaint, Firm-1 maintained a document management system that recorded the dates and times that users viewed, opened, or printed documents saved

on the document management system.  Documents saved on the
document management system also contained a document name, and a
"client" and "matter" number that categorized the client and the
legal matter to which the document related.  Attorneys at Firm-1
also billed their time using "client" and "matter" numbers.

## TRADING IN ADVANCE OF HANGER DELISTING

11.  Based on my review of documents provided by Firm-1 and
my conversations with representatives of Firm-1, I have learned
the following, in substance and in part:

a.  At all times relevant to this Complaint, Firm-1
served as legal counsel to Hanger on various legal matters,
including a delisting of Hanger stock from the NYSE.  In
connection with its representation of Hanger, Firm-1 was
entrusted with Hanger's confidential information.

b.  At all times relevant to this Complaint, WALTER
C. LITTLE, a/k/a "Chet," the defendant, did not bill any time to
Hanger's client number.

12.  Based on my review of documents provided by Firm-1, as
well as trading and telephone records, I have learned the
following, in substance and in part:

a.  On or about February 17, 2016, LITTLE accessed
Firm-1's document management system and viewed a document with
Hanger's client code titled, "Hanger – Form 8-K 2016 Delisting."
I know based on my training and experience that stocks are
sometimes "delisted" from their stock exchanges if the
underlying companies fail to meet certain criteria provided by
the exchange, such as making certain regulatory filings on a
timely basis.  Share prices tend to decrease in the event of a
delisting for regulatory noncompliance.

b.  On or about February 18, 2016, at approximately
9:29 a.m., LITTLE received a call from ANDREW M. BERKE, the
defendant, lasting approximately 35 seconds.[1]  Approximately
fifteen minutes later, BERKE purchased approximately 40 put
options for Hanger stock.[2]

---

[1] I am aware of LITTLE and BERKE's phone numbers based in part on
documents provided by Firm-1 and also brokerage accounts, which
list certain of LITTLE and BERKE's numbers.

[2] Based on my training and experience, I know that a put option
is, in substance, a contract giving the owner of the contract an

c.    On or about February 20, 2016, LITTLE accessed Firm-1's document management system and viewed documents with Hanger's client code titled "RAC Audit Investigation; Document Review Guidance" and "Hanger Word Tables for 8-K."

d.    On or about February 22, 2016, LITTLE purchased a total of approximately 26 put options for Hanger stock.

e.    On or about February 22, 2016, LITTLE accessed Firm-1's document management system and viewed a document with Hanger's client code titled "Draft Investor FAQ." Based on my review of documents, I understand that this document contains information created in anticipation of a potential delisting of Hanger's stock from the New York Stock Exchange. The following day, on or about February 23, 2016, LITTLE bought an additional 15 Hanger put options for approximately $2,100.

f.    On or about February 24, 2016, at approximately 11:09 a.m., LITTLE accessed Firm-1's document management system and viewed a document with Hanger's client code titled, "Hanger-Suspension of NYSE trading and commencemnt [sic] of OTC trading Press Release." Within a half hour, at approximately 11:23 a.m., LITTLE bought ten additional Hanger put options.

g.    On or about February 25, 2016, LITTLE accessed Firm-1's document management system and viewed a document with Hanger's client code titled, "2106.02.25 SEC Enforcement Meeting Memorandum." The next day, on or about February 26, 2016, between approximately 10:21 a.m. and 10:24 a.m., LITTLE and BERKE exchanged multiple phone calls and text messages. At approximately 1:36 p.m. the same day, BERKE purchased approximately 105 put options for Hanger stock.

h.    After the market had closed on or about Friday, February 26, 2016, Hanger filed a Form 8-K with the SEC stating, in substance and in part, that Hanger's shares would be delisted

---

option to sell a particular stock at a set price in the future called the "strike price." A call option, in turn, is an option to buy a particular stock at a set price in the future. A put option is considered "out-of-the-money" if the strike price is below the existing stock price, whereas a call option is considered "out-of-the-money" if the strike price is above the existing stock price. Put options (and other forms of options) allow investors to place bets on the direction that a stock will move in the future. An out-of-the-money option is likely to be more volatile in certain circumstances.

from the NYSE because Hanger had failed to meet the deadline for filing its 2014 10-K. Hanger also filed a press release stating, in substance and in part, that its shares would begin trading over-the-counter on or about February 29, 2016.

       i.   On or about Monday, February 29, 2016, Hanger's stock began trading over the counter and closed at approximately $2.49 a share, a drop of nearly 81% from the previous close of approximately $12.88 per share.

       j.   Between on or about March 1 and March 3, 2016, LITTLE sold approximately 81 Hanger put options for a total profit of approximately $58,596, and BERKE sold approximately 145 Hanger put options for a total profit of approximately $115,596.

## TRADING IN ADVANCE OF MAGNETEK ACQUISITION

    13.  Based on my review of documents provided by Firm-1 and my conversations with representatives of Firm-1, I have learned the following, in substance and in part:

       a.   At all times relevant to this Complaint, Firm-1 served as legal counsel to Magnetek on various legal matters. One of these matters related to a potential acquisition of Magnetek by Columbus McKinnon. In connection with its representation of Magnetek, Firm-1 was entrusted with Magnetek's confidential information.

       b.   At all times relevant to this Complaint, WALTER C. LITTLE, a/k/a "Chet," the defendant, did not bill any time to Magnetek's client number.

    14.  Based on my review of documents provided by Firm-1, as well as trading and telephone records, I have learned the following, in substance and in part:

       a.   Between on or about February 8, 2015 and May 24, 2015, WALTER C. LITTLE, a/k/a "Chet," the defendant, accessed Firm-1's document management system and viewed multiple documents with Magnetek's client code related to a merger with the codename "Project Megatron." For example, on or about February 12, 2015, LITTLE opened a document titled, "Project Megatron – Goldman Sachs Engagement Letter." On or about May 15, 2015, LITTLE viewed a document titled, "Project Megatron – Draft Merger Agreement." And on or about May 24, 2015, LITTLE viewed a document titled, "RE- Project Megatron – Engagement Letter & Confidentiality Agreement."

b.    On or about May 26, 2015 and May 28, 2015, LITTLE purchased approximately 3,172 shares of Magnetek stock for approximately $122,375.  On or about May 28, 2015, moreover, LITTLE and ANDREW M. BERKE, the defendant, exchanged multiple text messages.  Approximately five minutes after one such text message was exchanged, BERKE purchased 980 shares of Magnetek stock for approximately $30,752.  The following day, on or about May 29, 2015, BERKE purchased an additional 2,635 shares of Magnetek stock for approximately $87,864.

c.    Between on or about May 28, 2015 and on or about July 27, 2015, LITTLE accessed documents on Firm-1's document management system with Magnetek's client code and words "Megatron," "merger," "bid," or "offer" in the title approximately 73 times.  LITTLE also purchased Magnetek shares on multiple additional occasions, ultimately acquiring a total of approximately 5,697 shares.[3]  Certain of these purchases, moreover, occurred around the time LITTLE accessed Magnetek documents on Firm-1's document management system.  On or about June 1, 2015, for example, LITTLE opened a document with Magnetek's client code titled, "Project Megatron Bid Review." On or about the following day, June 2, 2015, LITTLE purchased an additional 1,500 shares of Magnetek stock for approximately $49,045.

d.    Between on or about May 28, 2015 and July 27, 2015, BERKE purchased a total of approximately 11,994 shares of Magnetek, including the purchases referenced above.[4]  Many of these purchases occurred in short proximity after communications with LITTLE.  For example, on or about July 23, 2015, LITTLE accessed multiple documents on Firm-1's document management system relating to "Project Megatron," including a document whose title referenced a "Revised Merger Agreement."  On or about July 24, 2015, between approximately 8:31 a.m. and 8:34 a.m., LITTLE and BERKE exchanged approximately six text messages.  Around an hour later, at approximately 9:41 a.m., BERKE purchased an additional 860 shares of Magnetek stock for approximately $27,998.

---

[3] Little sold approximately 775 shares before Columbus McKinnon announced its merger with Magnetek, thus resulting in a balance of approximately 4,922 shares on or about July 27, 2017.

[4] BERKE sold approximately 1,460 shares before Columbus McKinnon announced its merger with Magnetek, thus resulting in a balance of approximately 10,534 shares on or about July 27, 2017.

e.     Before the market opened on or about July 27, 2015, Magnetek filed an 8-K and press release announcing, in substance and in part, that it had reached an agreement with Columbus McKinnon whereby Columbus McKinnon would purchase all outstanding shares of Magnetek for approximately $50 a share. The 8-K also stated, in substance and in part, that the acquisition of Magnetek would technically take place through a wholly owned subsidiary of Columbus McKinnon named "Megatron Acquisition Corp.," which name corresponds to the codename for the acquisition in the above-referenced Firm-1 documents.

f.     After the merger with Columbus McKinnon was announced, Magnetek's stock closed at approximately $49.52 a share, an increase of over 50% from its previous close of approximately $32.25 a share.

g.     On or about July 27, 2015, after Magnetek's merger with Columbus McKinnon was announced, LITTLE sold his remaining 4,922 shares of Magnetek stock for a total profit of approximately $74,436.  BERKE, in turn, sold all of BERKE's remaining 10,534 shares of Magnetek stock for a total profit of approximately $166,177.

<u>TRADING ON DOUGLAS DYNAMICS EARNINGS</u>

15.    Based on my review of documents provided by Firm-1 and my conversations with representatives of Firm-1, I have learned the following, in substance and in part:

a.     At all times relevant to this Complaint, Firm-1 served as legal counsel to Douglas Dynamics on various legal matters.  In connection with its representation of Douglas Dynamics, Firm-1 was entrusted with Douglas Dynamics' confidential information.

b.     At all times relevant to this Complaint, WALTER C. LITTLE, a/k/a "Chet," the defendant, did not bill any time to Douglas Dynamics' client number.

16.    Based on my review of documents provided by Firm-1, as well as trading and telephone records, I have learned the following, in substance and in part:

a.     On or about July 20, 2015, WALTER C. LITTLE, a/k/a "Chet," the defendant, accessed Firm-1's document management system and viewed a document with Douglas Dynamics' client code titled "PLOW_2Q15_Earnings Release Draft_7.17.15_Updated."  Based on my training and experience, I

know that stock prices oftentimes increase or decrease significantly based on the strength or weakness of a company's reported quarterly earnings.

        b.   On or about July 28 and 30, 2015, LITTLE purchased a total of 2,530 shares of Douglas Dynamics stock for approximately $51,203.

        c.   On or about August 3, 2015, Douglas Dynamics' stock closed at approximately $20.76 per share.

        d.   After the market closed on or about August 3, 2015, Douglas Dynamics issued an 8-K and a press release announcing its second quarter 2015 results, which included an increase in net sales of approximately 21% as compared to the same quarter in the prior year.

        e.   On or about August 4, 2015, Douglas Dynamics' stock price closed at approximately $23.36 a share, an increase of 12.5% from the previous close of approximately $20.76 per share.

        f.   On August 6, 2015, LITTLE sold his 2,530 shares of Douglas Dynamics for a total profit of approximately $6,167.

## TRADING ON PENTAIR EARNINGS AND MERGER

    17.   Based on my review of documents provided by Firm-1 and my conversations with representatives of Firm-1, I have learned the following, in substance and in part:

        a.   At all times relevant to this Complaint, Firm-1 served as legal counsel to Pentair on various legal matters, including earnings releases and a merger.  In connection with its representation Pentair, Firm-1 was entrusted with Pentair's confidential information.

        b.   At all times relevant to this Complaint, WALTER C. LITTLE, a/k/a "Chet," the defendant, did not bill any time to Pentair's client number.

## 2Q 2015 Earnings

    18.   Based on my review of documents provided by Firm-1, as well as trading and telephone records, I have learned the following, in substance and in part:

a.     On or about July 15, 2015, WALTER C. LITTLE,
a/k/a "Chet," the defendant, accessed Firm-1's document
management system and opened a document with Pentair's client
code titled "Q2 2015 10-Q Draft #1."  Based on my training and
experience, I know that quarterly SEC filings (that is, 10-Qs)
generally contain earnings reports for the issuing company, and
are accordingly kept confidential until publicly released.

b.     Between on or about July 17, 2015 and July 20,
2015, LITTLE purchased approximately 40 out-of-the-money put
options for Pentair stock.

c.     On or about July 21, 2015, before the market
opened, Pentair issued a press release announcing lower second-
quarter earnings as compared to the previous year.  Pentair also
filed a 10-Q with the SEC reporting the same.

d.     After releasing its earnings, Pentair's stock
price subsequently closed at approximately $61.60 per share, a
decrease of approximately 3.8% from the previous day's close of
approximately $64.08 per share.

e.     Between on or about July 24, 2015 and July 27,
2015, LITTLE sold the 40 put options that he had purchased,
generating a total profit of $924.

### Pentair Merger Announcement

19.  Based on my review of documents provided by Firm-1, as
well as trading and telephone records, I have learned the
following, in substance and in part:

a.     Between on or about July 6, 2015 and August 5,
2015, WALTER C. LITTLE, a/k/a "Chet," the defendant, accessed
documents on Firm-1's document management system with Pentair's
client code that referenced "Project Lionel" or "Lionel"
approximately eight times.  On or about July 13, 2015, for
example, LITTLE viewed a document titled, "Project Lionel –
Initial Due Diligence Memo."  On or about July 16, 2015, LITTLE
viewed a document titled, "Pentair plc – Board Resolutions –
Project Lionel Acquisition Approval."  And on or about August 5,
2015, LITTLE opened a document titled, "Pentair – Commitment
Letter (Lionel) (8-4-15 F&L comments)."

b.     On or about August 5, 2015, between approximately
6:01 p.m. and 10:36 p.m., LITTLE and ANDREW M. BERKE, the
defendant, exchanged approximately three text messages and five
phone calls.  The following day, on or about August 6, 2015,

BERKE purchased approximately 268 Pentair call options.  And on or about August 10, 2015, BERKE purchased approximately 100 additional out-of-the-money call options on Pentair stock.

        c.   On or about August 11, 2015, at approximately 7:22 a.m., LITTLE accessed Firm-1's document management system and viewed a document with Pentair's client code titled, "Project Lionel – Form 8-K (Execution of Merger Agreement)." Less than an hour later, at approximately 8:12 a.m., LITTLE and BERKE exchanged a phone call.

        d.   Between on or about August 11, 2015 and August 14, 2015, BERKE purchased approximately 532 additional Pentair call options, of which approximately 300 were out-of-the-money. Between on or about August 12, 2015 and August 13, 2015, moreover, LITTLE purchased approximately 133 Pentair call options, of which approximately 40 were out-of-the-money.

        e.   On or about August 17, 2015, before the market opened, Pentair issued a press release prior to the opening of trading announcing that it was acquiring ERICO Global Company ("ERICO") for approximately $1.8 billion in cash.  Pentair subsequently filed an 8-K with the SEC stating, in substance and in part, that the merger would occur through two wholly owned subsidiaries of Pentair named "Pentair Lionel Acquisition Co." and "Pentair Lionel Merger Sub, Inc," which correspond to the codename used in Firm-1 documents referenced above.  After the announcement, Pentair's stock price closed at approximately $62.60 a share, an increase of 1.5% from the previous day's close of approximately $61.67 per share.

        f.   On or about August 17, 2015, the same day as Pentair's announcement of its merger with ERICO, LITTLE sold approximately 93 Pentair call options for a total profit of approximately $9,051.  BERKE, in turn, sold approximately 448 Pentair call options for a total profit of approximately $25,538.

TRADING ON OSHKOSH EARNINGS

    20.   Based on my review of documents provided by Firm-1 and my conversations with representatives of Firm-1, I have learned the following, in substance and in part:

        a.   At all times relevant to this Complaint, Firm-1 served as legal counsel to Oshkosh on various legal matters, including earnings releases.  In connection with its

17

representation of Oshkosh, Firm-1 was entrusted with Oshkosh's confidential information.

        b.   At all times relevant to this Complaint, WALTER C. LITTLE, a/k/a "Chet," the defendant, did not bill any time to Oshkosh's client number.

    21.   Based on my review of documents provided by Firm-1, as well as trading and telephone records, I have learned the following, in substance and in part:

        a.   On or about July 13, 2015, WALTER C. LITTLE, a/k/a "Chet," the defendant, accessed Firm-1's document management system and viewed a document with Oshkosh's client code titled "draft 8-K." Several days later, on or about July 19, 2015, LITTLE viewed a document with Oshkosh's client code titled, "Fiscal 2015 Q3 conference call slides, script and press release for review." Based on my training and experience, I believe that these materials relate to a draft 8-K filing that would contain information regarding Oshkosh's third-quarter 2015 earnings, which would have been nonpublic at the time.

        b.   Between on or about July 28, 2015 and July 29, 2015, LITTLE purchased approximately 75 put options for Oshkosh stock.

        c.   On or about July 30, 2015, before the stock market opened, Oshkosh issued a press release announcing its third quarter results for 2015, including, in substance and in part, a 16.6 percent decrease in consolidated net sales as compared to the prior year's third quarter. Later that day, moreover, Oshkosh filed a Form 8-K and 10-Q with the SEC reporting the same results.

        d.   After releasing its earnings, Oshkosh stock closed at approximately $36.05 per share, a decrease of approximately 7.7% from the previous close of approximately $39.05 per share.

        e.   Between on or about July 30 and July 31, 2015, LITTLE sold the 75 put options he had purchased for a total profit of approximately $28,991.[5]

---

[5] Between on or about July 23, 2015 and July 27, 2015, LITTLE and BERKE exchanged approximately 20 text messages. On or about July 30, 2015, moreover, BERKE purchased 50 put options for Oshkosh stock. BERKE subsequently sold these options that same day for a total loss of approximately $529.

## TRADING ON HARLEY DAVIDSON EARNINGS

22.   Based on my review of documents provided by Firm-1 and my conversations with representatives of Firm-1, I have learned the following, in substance and in part:

a.   At all times relevant to this Complaint, Firm-1 served as legal counsel to Harley Davidson on various legal matters, including earnings releases.  In connection with its representation of Harley Davidson, Firm-1 was entrusted with Harley Davidson's confidential information.

b.   At all times relevant to this Complaint, WALTER C. LITTLE, a/k/a "Chet," the defendant, did not bill any time to Harley Davidson's client number.

23.   Based on my review of documents provided by Firm-1, as well as trading and telephone records, I have learned the following, in substance and in part:

a.   On or about April 15, 2015, WALTER C. LITTLE, a/k/a "Chet," the defendant, accessed Firm-1's document management system and viewed a document with Harley Davidson's client code titled "HD Q1-15 Release DRAFT 4-12."  Based on my training and experience, I believe that this document relates to Harley Davidson's first-quarter 2015 earnings, which would have been nonpublic at the time.

b.   On or about April 16, 2015, LITTLE purchased 120 put options on Harley Davidson stock.  Approximately 100 of these options were out-of-the-money.  On or about April 17, 2015, moreover, LITTLE purchased an additional 30 put options on Harley Davidson stock.

c.   On or about April 21, 2015, before the market opened, Harley Davidson issued a press release announcing that it had earned "consolidated revenue of $1.67 billion compared to ... consolidated revenue of $1.73 billion in last year's first quarter" – that is, Harley Davidson announced that revenue "was down from the year-ago period."

d.   On or about April 21, 2015, after releasing its earnings, Harley Davidson's stock closed at approximately $55.72 per share, a decrease of approximately 9.8% from the previous close of approximately $61.77 per share.

        e.   On or about April 21, 2015, LITTLE sold the 150
Harley Davidson put options he had purchased, realizing a total
profit of approximately $21,906.

## TRADING ON WHITING EARNINGS

        24.   Based on my review of documents provided by Firm-1 and
my conversations with representatives of Firm-1, I have learned
the following, in substance and in part:

        a.   At all times relevant to this Complaint, Firm-1
served as legal counsel to Whiting on various legal matters,
including earnings releases and a securities offering.   In
connection with its representation of Whiting, Firm-1 was
entrusted with Whiting's confidential information.

        b.   At all times relevant to this Complaint, WALTER
C. LITTLE, a/k/a "Chet," the defendant, did not bill any time to
Harley Davidson's client number.

### 4Q 2014 Earnings

        25.   Based on my review of documents provided by Firm-1, as
well as trading and telephone records, I have learned the
following, in substance and in part:

        a. On or about February 10, 2015, WALTER C. LITTLE, a/k/a
"Chet," the defendant, accessed Firm-1's document management
system and viewed a document with Whiting's client code titled
"12 31 2014 10K – v3_FL Comments."   Between on or about February
11, 2015 and February 12, 2015, moreover, LITTLE viewed and
opened documents saved on Firm-1's document management system
titled "RE – Whiting Form 10-K" and "Whiting Press Release
Draft."   Based on my training and experience, I believe that
these materials relate to Whiting's then-confidential 2014 10-K,
which would contain information regarding Whiting's fourth
quarter 2014 earnings.

        b. Between on or about February 17, 2015 and February 19,
2015, LITTLE purchased approximately 58 out-of-the-money put
options for Whiting stock.   Between on or about February 17,
2015 and February 23, 2015, moreover, ANDREW M. BERKE, the
defendant, purchased approximately 30 out-of-the-money put

options for Whiting stock and wrote approximately 30 call options or Whiting stock.[6]

c. On or about February 23, 2015, LITTLE accessed Firm-1's document management system and viewed a document with Whiting's client code titled, "WLL Form 10-K." The next day, on or about February 24, 2015, between approximately 10:02 a.m. and 2:14 p.m., LITTLE and BERKE exchanged approximately three text messages and had a phone call that lasted over approximately nineteen minutes. Within approximately one hour of that phone call, BERKE purchased approximately 200 additional out-of-the-money put options on Whiting stock.

d. On or about February 25, 2015, between approximately 10:38 a.m. and 2:10 p.m., LITTLE purchased approximately 105 additional out-of-the-money put options on Whiting stock, and BERKE purchased approximately 571 additional out-of-the money put options on Whiting stock.[7] BERKE also wrote approximately 50 call options on Whiting stock.

e. At approximately 4:00 p.m. on or about February 25, 2015, minutes after BERKE's final purchases of put options, Whiting issued a press release announcing its financial results for the fourth quarter and full year 2014. Whiting's press release stated, in substance and in part, that Whiting had achieved total revenues of $696 million for the fourth quarter of 2014 as compared to $720 million for the same period during the prior year. At approximately 4:32 p.m., Whiting filed a Form 8-K reporting the same results.

f. On or about February 26, 2015, Whiting's stock price closed at approximately $34.00 a share, a decrease of approximately 7.5% from the previous close of approximately $36.77 per share.

---

[6] Based on my training and experience, I know that writing — or, alternatively, "selling" — a call option is equivalent to selling the right to purchase stock at a particular price in exchange for a sum of money. I also know that investors sometimes write call options in order to make a bet that the price of a stock will decrease or remain below the strike price associated with the option.

[7] BERKE also sold approximately 50 put options for Whiting stock on or about February 25, 2015.

g. On or about February 26, 2015 and February 27, 2015, LITTLE sold approximately 85 put options for Whiting stock for a total profit of approximately $3,350.  BERKE, in turn, covered the 50 call options BERKE had written, realizing a profit of approximately $2,098.[8]

## Securities Offering

26.   Based on my review of documents provided by Firm-1, as well as trading and telephone records, I have learned the following, in substance and in part:

a.   Between on or about March 3, 2015, and March 13, 2015, WALTER C. LITTLE, a/k/a "Chet," the defendant, accessed Firm-1's document management system and opened or viewed multiple documents relating to a securities offering being planned by Whiting.  For example, on or about March 6, 2015, LITTLE opened a document with Whiting's client code titled, "Whiting Petroleum - 2015 Mandatory Convertible Preferred Stock Offering Prospectus Supplement."  On or about March 7, 2015, LITTLE opened a document with Whiting's client code titled, "Whiting 2015 - Prospectus Supplement - Common Stock_Revised." And on or about March 13, 2015, LITTLE viewed a document with Whiting's client code titled, "Whiting -- 2015 Offerings -- Launch Press Release."  Based on my training and experience, I know that stock offerings can reduce the value of a company's stock by diluting the value of each share.

b.   Between on or about March 14, 2015 and March 16, 2015, LITTLE and ANDREW M. BERKE, the defendant, exchanged approximately 16 text messages, three phone calls, and two voicemails.

c.   Between on or about March 17 and March 18, 2015, LITTLE accessed Firm-1's document management system and viewed or opened multiple documents relating to planned Whiting securities offerings, including documents titled "WLL 2015 Shelf S-3 ASR (Post-effective Amendment)," "Whiting -- 2015 Offerings -- Launch Press Release,"  and "WLL-WOGC Board Consent (2015 Senior Notes Offering)."  LITTLE and BERKE, moreover, exchanged approximately eight text messages during this period.

d.   On or about March 19, 2015, LITTLE accessed Firm-1's document management system and viewed a document with

---

[8] BERKE also sold approximately 69 put options on Whiting stock on or about February 27, 2015 for a loss of approximately $503.

Whiting's client code titled, "WLL - Form 8-K (Pro Forma)."[9] Within approximately 10 minutes of viewing this document, LITTLE purchased 10 out-of-the-money put options for Whiting stock. Later in the day, LITTLE purchased approximately 305 additional out-of-the-money put options for Whiting stock.

        e.   On or about March 20, 2015, LITTLE accessed Firm-1's document management system and viewed or opened multiple documents relating to planned Whiting securities offerings, including "Whiting 2015 - Prospectus Supplement - Common Stock_Revised," and "WLL -- Form 8-K -- (Pro Forma)."   Later that day, on or about 1:03 p.m., LITTLE and BERKE exchanged a phone call lasting approximately 12 minutes.   BERKE purchased approximately 527 out-of-the-money put options on Whiting stock within two hours of the conclusion of that call.

        f.   On or about March 23, 2015, before market close, BERKE purchased an additional 305 out-of-the-money put options on Whiting stock.

        g.   On or about March 23, 2015, after market close, Whiting issued press releases stating, in substance and in part, that Whiting would be commencing offerings of (i) $1 billion of convertible senior notes due in 2020; (ii) $750 million of notes due in 2023; and (iii) 35,000,000 shares of its common stock. Whiting subsequently filed an 8-K with the SEC disclosing, in substance and in part, the same offerings.

        h.   On or about March 24, 2015, after Whiting had announced the aforementioned securities offerings, Whiting's stock closed at approximately $30.91 a share, a decrease of approximately 19.48% from its previous close of approximately $38.39 per share.

        i.   Between on or about March 24, 2015 and March 25, 2015, LITTLE sold approximately 315 put options for Whiting stock for a total profit of approximately $120,453.   BERKE, in turn, sold approximately 722 put options in Whiting stock for a total profit of approximately $293,671.

---

[9] Based on my training and experience, I know that companies are generally required to file Form 8-Ks with the SEC in connection with securities offerings.

## 2Q 2015 Earnings

27.   Based on my review of documents provided by Firm-1, as well as trading and telephone records, I have learned the following, in substance and in part:

a.   Between on or about July 16, 2015 and July 22, 2015, WALTER C. LITTLE, a/k/a "Chet," the defendant, accessed Firm-1's document management system and viewed documents with Whiting's client code titled, "WLL_8-K 2nd Quarter Pre-Release" and "Form 10-Q 6 30 15_FL Comments."  Based on my training and experience, I believe that the titles of these documents relate to filings that Whiting would make before releasing its second-quarter 2015 earnings to the public.

b.   Between on or about July 23, 2015 and July 27, 2015, LITTLE and ANDREW M. BERKE, the defendant, exchanged approximately 20 text messages.

c.   Between on or about July 28, 2015 and July 29, 2015, BERKE purchased approximately 1,000 put options for Whiting stock, approximately 700 of which were out-of-the-money. On or about July 29, 2015, moreover, LITTLE purchased approximately 315 put options for Whiting stock, approximately 275 of which were out of the money, before the close of trading.

d.   On or about July 29, 2015, after the close of trading, Whiting issued a press release reporting, in substance and in part, adjusted diluted earnings per share of $0.04 on revenues of $590 million in the second quarter of 2015.  These results were significantly below Whiting's adjusted diluted earnings per share of $1.40 on revenues of $835.62 million in the second quarter of the previous year.  Whiting subsequently filed an 8-K and 10-Q with the SEC relating to these results.

e.   On or about July 30, 2015, Whiting's stock price closed at approximately $22.38 per share, a 3.57% decrease from its previous close of approximately $23.18 per share.

f.   Between on or about July 30, 2015 and August 6, 2015, LITTLE sold approximately 315 put options on Whiting stock for a total profit of approximately $34,499.  And on or about July 30, 2015, BERKE sold approximately 550 put options on Whiting stock for a total profit of approximately $28,152.

## 3Q 2015 Earnings

28.  Based on my review of documents provided by Firm-1, as well as trading and telephone records, I have learned the following, in substance and in part:

a.   On or about October 22, 2015, WALTER C. LITTLE, a/k/a "Chet," the defendant, accessed Firm-1's document management system and viewed documents with Whiting's client code titled, "WLL Form 10-Q," " WLL 2015 Q3 Script v1_FL Comments," and "Q3 15Earnings_Release_Draft_FL Comments."  On or about October 28, 2015, moreover, LITTLE viewed additional documents with Whiting's client code titled, "Form 10-Q 9 30 2015 - v2 accept_FL Comments," "WLL 2015 Q3 Script v1_FL Comments," "Q3 15Earnings_Release_Draft_FL Comments," and "RE-Whiting Earnings Packet."

b.   On or about October 28, 2015, after viewing the documents referenced above in subparagraph (a), LITTLE purchased approximately 60 put options for Whiting stock, of which approximately 40 were out-of-the-money.

c.   After the market closed on or about October 28, 2015, Whiting issued a press release reporting, in substance and in part, an adjusted net loss per diluted share of $0.17, as compared to adjusted net income per diluted share of $1.24 in the third quarter of the previous year.  Whiting subsequently filed an 8-K and 10-Q with the SEC reporting these results.

d.   On or about October 29, 2015, the day after Whiting issued its third-quarter 2015 earnings, Whiting's stock closed at approximately $16.46 per share, a 3.5% decrease from its previous close of approximately $17.06.

e.   On or about October 29, 2015, LITTLE sold approximately 60 Whiting put options for a total profit of approximately $1,625.

## RELATIONSHIP BETWEEN LITTLE AND BERKE

29.  Based on my review of documents provided by Firm-1, as well as my review of public records, I have learned the following, in substance and in part:

a.   Between at least in or about May 2013 and November 2016, LITTLE owned a residence near one owned by BERKE.

        b.    BERKE and LITTLE engaged in a series of business
and financial transactions.    For example:

            i.    In or about 2013, BERKE and LITTLE worked on
a real estate transaction in which LITTLE agreed, in substance
and in part, to pay BERKE a consulting fee.    In a June 15, 2013,
email, LITTLE addressed BERKE, "Yo, dude," and told BERKE that,
in connection with the contemplated real estate transaction,
LITTLE would "hand [BERKE] a check on Sunday for $18,200 and
(hopefully by then) a consulting agreement reflecting a
consulting fee of $18,200."

            ii.    On or about June 2, 2016, July 21, 2016, and
October 24, 2016, LITTLE deposited checks given to him by BERKE
in the amounts of, respectively, approximately $22,000, $59,000,
and $12,000.    Notes on the face of two of the checks indicated,
in substance and in part, that they were being provided as
payment for legal services.


     WHEREFORE, the deponent prays that arrest warrants be
issued for WALTER C. LITTLE, a/k/a "Chet," and ANDREW M. BERKE,
the defendants, and that they be imprisoned or bailed as the
case may be.



                            _____
                            BEMPSEY G. CO
                            SPECIAL AGENT, FBI


Sworn to before me this
5th day of May, 2017


_____
THE HONORABLE SARAH NETBURN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK