**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No: 1:17-cr-00450-KPF |
| Plaintiff, | ) | |
| | ) | **DEFENDANT LITTLE'S SENTENCING** |
| vs. | ) | **MEMORANDUM** |
| | ) | |
| Walter C. Little, a/k/a "Chet," and | ) | |
| Andrew M. Berke | ) | |
| | ) | |
| Defendants. | ) | Hon. Katherine Polk Failla |
| _____ | ) | |

Defendant Walter C. Little, by and through undersigned counsel, respectfully submits this Sentencing Memorandum for the Court's consideration.

Mr. Little requests that this Court review the circumstances of his case pursuant to 18 USC § 3553(a) and impose a sentence of time-served, to be followed by a term of supervised release with the special conditions of home confinement and 200 hours of community service. In the event the Court were to impose a jail sentence, Mr. Little requests sixty (60) days to surrender from the date of his sentencing.

**STATEMENT OF FACTS**

1. On May 11, 2017, Walter Chester Little, Jr., who goes by "Chet," was arrested for, among other things, Conspiracy to Commit Securities Fraud.

2. On October 16, 2017, Mr. Little entered into a plea agreement with the United States of America, pursuant to which Mr. Little agreed to plead guilty to Conspiracy to Commit Securities Fraud, in violation of 18 USC §371. The parties stipulated to the following sentencing guidelines: (1) a base-level offense of eight (8), pursuant to USSG §2B1.4(a); (2) a 14-level increase for loss

1

greater than $550,000 but less than $1,500,000, pursuant to USSG §2B1.4(b)(1) and USSG §2B1.1(b)(1)(H); (3) a 2-level increase for abuse of a position of private trust pursuant to USSG §3B1.3; and (4) a 3-level reduction for acceptance of responsibility pursuant to USSG §3E1.1. In total, the parties agreed that Mr. Little's guideline offense level was 21 with Criminal History Category 1. Mr. Little agreed to forfeit $452,998. Mr. Little may seek a downward variance based upon the factors listed in 18 USC §3553(a).

3. On November 9, 2017, Mr. Little pled guilty to Conspiracy to Commit Securities Fraud.

4. On January 31, 2018, US Probation filed their Revised Final Presentence Investigation Report which recommended a downward variance of twelve (12) months, yielding a sentence of 24-months incarceration. [Dkt. 43]. Additional arguments in support of variance are being made herein, which it is submitted justifies a non-incarcerative sentence.

5. Mr. Little is scheduled for sentencing on February 22, 2018.

6. Mr. Little moves the Court to grant a downward variance and sentence him to a term of time served, to be follow by a term of supervised release with the special conditions of home confinement and 200 hours of community service. Compelling reasons exist for granting this variance, including: (1) as a direct result of this case, Mr. Little's career as an attorney, which he built and cultivated for more than 15-years, is destroyed and he faces permanent disbarment and a loss of livelihood as a convicted felon; (2) Mr. Little bears a crippling tax burden of more than $300,000 as a result of his termination from his former law firm[1]; (3) Mr. Little faces large fines

---

[1] Foley & Lardner operates on a February 1 to January 31 fiscal calendar. Thus, Mr. Little's 2016 AGI includes income that Mr. Little earned between February 1, 2015 and January 31, 2016 as well as income that Mr. Little earned between February 1, 2016 and his departure from Foley later that year, which income only became part of his 2016 AGI as a result of his departure. Mr. Little's 2016 Adjusted Gross Income also includes income from Mr. Little's subsequent employer, Bradley Arant. As a partner, Mr. Little would have paid his taxes with a bonus that he received in 2016, but since he was terminated he did not get that bonus. Further, he was denied refund of his capital contribution from the law firm he joined after leaving Foley. The $300,000 figure will continue to grow due to interest and penalties.

and penalties from a parallel SEC action, styled *S.E.C. v. Walter C. Little and Andrew M. Berke*, No. 1:17-cv-03536-JGK; (4) Mr. Little is participating in a rigorous, multi-year, Florida Bar-sponsored drug and alcohol rehabilitation program; and (5) BOP statistics support that Mr. Little is a very low risk for reoffending. However, and perhaps the most compelling reason to grant a downward variance, is the fact that for the entirety of his charged conspiracy Mr. Little suffered from undiagnosed bipolar disorder, a mental condition which, left unchecked, resulted in distorted judgment and reasoning. To complicate matters for Mr. Little, his issue was exacerbated by his doctor's diagnosis of ADD and prescription for Vyvanse, an amphetamine which not only fueled Mr. Little's underlying bipolar disorder but increased his manic symptomology and seriously impacted his judgment and mental state throughout the course of the charged conspiracy. Since that time, Mr. Little has been treated for bipolar disorder with an appropriate mood stabilizer. *See, Dr. Danziger Expert Report*, *Dr. Devine Letter*. Put simply, Mr. Little's misdiagnosis and use of a prescribed powerful amphetamine, according to two independent psychiatrists, played a large role in his reasoning and judgment which resulted in this criminal behavior. This strongly mitigates the need for incarceration.

## **MEMORANDUM OF LAW**

### *Introduction*

This memorandum examines whether a variance is appropriate under 18 U.S.C. §3553(a), notwithstanding the stipulated offense level. It concludes that, in Mr. Little's case, a variance is warranted.

### I.   **Booker and its Progeny Provides the Court with the Discretion to Impose a Sentence of Home Detention**

As the Court is aware, the sentencing guidelines are advisory. *United States v. Booker*, 543 US 220, 245-267 (2005). As a result, the Court has the power to "consider every convicted

person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 US 38, 52 (2007) (quoting *Koon v. United States*, 518 US 81 (1996)). The use of the guidelines in other than an advisory function violates the defendant's Sixth Amendment rights. *Booker*, 543 US at 244-45.

In determining whether sufficient circumstances exist to support a variance, the Court must examine the seven factors outlined in 18 USC §3553(a):

(1) The nature and circumstances of the offense and the history and characteristics of the defendant;
(2) The need for the sentence imposed –
    (a) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (b) To afford adequate deterrence to criminal conduct;
    (c) To protect the public from further crimes of the defendant; and
    (d) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) The kinds of sentences available;
(4) The kinds of sentence and the sentencing range established…
(5) Any pertinent [Sentencing Commission] policy statement…
(6) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) The need to provide restitution to any victims of the offense.

In this matter, sufficient circumstances exist to support a downward variance.

## II.     An Examination of the 18 USC §3553(a) Factors Establishes that a Variance is Warranted in Mr. Little's Case

The following sections analyze the 18 USC §3553(a) factors against the factual backdrop of Mr. Little's case. This analysis underscores the inherent necessity of Mr. Little's requested sentence.

1. **The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

In Mr. Little's case, the nature and circumstances of the offense and the history and characteristics of Mr. Little are inherently intertwined and discussed together below.

A. <u>Mr. Little's Life</u>

i. *Impressions of family and friends*

Mr. Little, who goes by 'Chet,' is a 44-year old attorney and lifelong resident of Florida. *PSR*, p. 2, ¶147. He lives in Tampa, Florida with his wife, Angela, and their 10-year old daughter. By all accounts, he is a model father and husband. His mother-in-law, Carol Carden, calls him a "kind, hard-working, loving wonderful father, husband, and son-in-law." *Letter from Carol Carden*. She could not ask for a better husband for her daughter or father for her granddaughter. As evidence, she points to the day Chet's daughter was born. Mrs. Carden says she "had never seen a grown man cry – he was so upset that he couldn't do anything but stand by his wife, but that was all she needed." *Letter from Carol Carden*.

Going forward, Chet gave everything he could to his family. His brother David recounts, "although Chet's family wanted for nothing; when it came to Chet himself, nothing! No fancy cars, no toys in the garage not even a golf membership." *Letter from David Little*. This impression of Chet is a common refrain. Time and again, his closest acquaintances recall Chet as a person who routinely puts family and friends above all. Family friend, Rebecca Gelston recounts her children's fond memories of Chet:

> For my nine and ten-year old boys it's chasing lizards and Chet teaching them how to gently catch them and attach them to his ears. There was nothing better in their eyes and their peals of laughter were sheer joy. They still ask him to do it when we see him – and he does!

*Letter from Rebecca Gelston*. Chet's sister-in-law, Allison Greene, recounts:

[F]or the last several years, Chet has been kind enough to take my daughters with him and his family on their summer vacation. My daughters would not have had these experiences because as a single mom for the last few years, I have not been able to set money aside for vacations. Chet was very attentive and kind to my daughters while on these trips. He talked with them about school and sports, and encouraged them to work hard so that they could get scholarships for college.

*Letter from Allison Greene*. His close friend Richard Hornsby recounts that:

Chet has always been a loyal and dependable friend. And while I speak from my own experience, I know my experience is reflective of how Chet has treated all his friends. In law school, I was arrested for disorderly conduct and Chet was the one to bail me out of jail. After law school, my fiancé called off our engagement and left me broken hearted, Chet was one of the first people to reach out to me and continued to reach out and lend a much-needed ear, even after many of my other friends had grown tired of hearing my self-pity.

*Letter from Richard Hornsby*. Finally, his client and friend, Eugene Son, recalls the following:

In our fast-paced work environment where time is often the most limited resource, it is rare to see someone put aside their hectic schedule and professional priorities to enhance the day to day experience of those who they love. Seven years ago, Chet invited his father to go offshore fishing with me and some clients. While fishing, Chet's father strained his back and was in great discomfort. Rather than telling his dad to tough out the pain of the boat launching off waves at 40 mph, Chet chose to slowly steam the 25 miles back to port at 5 mph despite the protests of many onboard. While this decision was not ideal for his professional objectives of client entertainment, it was without question the right decision and illustrative of the care and concern that he has for those who he loves.

*Letter from Eugene Son*.

Beyond family, Chet is focused on his community. As an attorney, in 2015 and 2016, Chet represented Sertoma, a non-profit entity that serves deaf children and adults by providing free screenings and evaluations across the State of Florida. They also provide financial assistance for the purchase of hearing aids. Chet represented Sertoma pro bono and worked on their State of Florida contracts, contracts with subcontractors, and negotiations with hospitals. With Chet's help, Sertoma was able to raise more funds to help more children. Debra Golinski, the Executive Director of Sertoma, believes that Chet "was eager and willing to help the precious deaf children

that we serve" and that Chet "embraced the fact that his efforts contributed to the success of children." *Letter from Debra Golinski*.

This is the essence of Walter "Chet" Little – a man who loves friends, family, and his community, and who consistently shows that love with action.  He is generous with his time and energy and serves those around him such that their lives, and our community, are better.

### ii.    Childhood

Chet, like all of us, is a product of his life experiences.  By all accounts, his childhood was not easy.  Richard Hornsby, Chet's long-time friend, described Chet's upbringing as "unstable, difficult, and lacking a basic level of nurturing that many children have difficulty overcoming."

Chet was born in July 1973 in Fort Lauderdale, Florida.  When he was 10, his parents divorced.  *PSR, ¶147*.  The divorce was bitter and nasty.  *Letter from David Little*.  His father stayed in Florida while his mother and brother moved to Nevada.  *See, Id*.  Chet remained in his father's care and had sporadic contact with his mother thereafter.  *PSR,  ¶147*.  Chet's brother, David Little, believes that the weeks and months following the divorce had a direct impact on Chet's emotional wellbeing.   According to David Little, their father's "comments about our mother; phrases like 'your mother gave you up,' 'she abandoned you,' and 'she chose David over you' had a devastating and permanent impact on Chet's relationship" with his mother.  *Letter from David Little*.

After the divorce, Chet and his father moved to Starke, Florida, a small rural town, where his father owned and operated an ice manufacturing company[2].  *Letter from David Little*; *PSR ¶179*; *Letter from Walter Little*.  From a young age, Chet worked for the ice company, hauling ice

---

[2] Reportedly, in 2010, the population of Starke, Florida was 5,449 people.

in the hot sun after school and on the weekends. *Letter from Walter Little*. His father worked long hours and Chet often came home to an empty house. *PSR, ¶151*.

Chet's brother, David, recalls that Starke, Florida and Southern California, where David lived, were vastly different. Chet saw these differences when he visited his mother and brother in Southern California during the summers. The level of wealth and possibility in Southern California made him "hate/resent Starke" and drove Chet to excel in school and later college. *Letter from David Little*. Chet recounts that he was an "average" student until he reached high school; at which point he "turned it up" and began to earn higher grades. PSR, ¶179.

College to the Little family was not unheard of but it was also not expected. *Letter from David Little*. Chet's father had not saved for college and Chet's mother could not afford to help. His father provided where he could, but Chet worked and applied for scholarships to make up the difference. *Letter from David Little*. Eventually, Chet could not pay for everything on his own. He asked his mother for help and she denied him. David Little believes this to be a pivotal moment in Chet's life:

> [O]n one hand it reinforced our father's phrases, "she gave up on you" and "she abandoned you"; on the other hand it drove him to work harder, to excel and show everyone that he could do this without anyone's help.

Motivated to succeed, Chet worked to build his future and eventually received his undergraduate degree from the University of Florida in 1995. *PSR, ¶177*. In 2000, he received his law degree from the University of Florida. *Id*. His brother, David, and his sister-in-law were there for his graduation and bought his first suit for his first job interview. *Letter from David Little*. They were and are very proud of his accomplishments. *Letter from David Little*.

### iii. Angela & Daughter

In 2001, while studying for the bar exam, Chet met Angela Carden, who he later married. *PSR*, ¶152. Angela became the center of his life until 2007 when that circle expanded to include

8

their daughter. According to David Little, "their happiness and well being became his next goal and ambition." Richard Hornsby recounts that:

> Chet was extremely supportive of Angela's career and moved to where her work would take her in Florida, notwithstanding the professional base he had developed in his career. After their daughter {E.} was born, Chet became the definition of a loving and doting parent. Whenever we spoke, our conversations almost always centered on our children, their education, their activities, and how happy we were that they had the financial and family support we lacked as children.

This sentiment is echoed by the people closest to Chet and Angela, including Angela's mother and sister.

### iv.    *Professional Life*

Chet advanced professionally, moving from one respected law firm to the other. *Letter from Richard Hornsby*. For the next fifteen years, Chet built a career in real estate and transactional law. He was very good at his job. According to his clients, he exhibited high ethical behavior. For them, Chet's behavior in the instant matter is an aberration from the man they know and with whom they have worked. For example, Eugene Son, a lender for financial institutions, tells the Court that Chet was:

> [C]learly more competent and harder working than the long-established Tampa attorneys that our firm had historically engaged. The financial institutions that I served agreed that his legal acumen and work ethic warranted a switch in legal representation. Over dozens of financing transactions, totaling several hundred million dollars, Chet faithfully and competently advocated for the best interest of the bank and the clients that he served.

Similarly, Deb Golinski, of Sertoma, recounts that Chet always worked with the highest integrity and went out of his way to provide us with the best guidance and service."

### B.  Medical Issues

These accomplishments are all the more impressive because, throughout his adult life, Mr. Little has suffered from undiagnosed and untreated bipolar disorder. Under normal circumstances, undiagnosed and untreated bipolar disorder can cause periods of hypomania, grandiosity, poor

judgment, and reckless involvement in activities like spending sprees and foolish business investments. *Expert Report of Dr. Jeffrey Danziger,* p. 10.

However, Mr. Little's circumstances were far from normal. Instead of being treated for bipolar, Mr. Little was diagnosed as ADD and prescribed the maximum recommended dose of the powerful amphetamine Vyvanse. Between 2011 and 2017, Mr. Little's prescription for Vyvanse directly impacted his undiagnosed and untreated bipolar disorder. The Vyvanse increased his manic symptomology and adversely impacted his judgment and reasoning. *Danziger*, p. 11. This tragic medical error coincides with Mr. Little's criminal behavior and helps explain why a lawyer with no history of ethical misconduct would engage in this behavior.

### i.  *Misdiagnosis*

From early adulthood, Mr. Little has suffered from depressive bouts, lasting anywhere from weeks to months, during which he suffers from feelings of helplessness, loss of joy, fatigue, insomnia, and a tendency to isolate himself. *Danziger*, p. 7.

In 2011, he had an "episode in which he 'passed out' in the shower. *PSR*, ¶165. His doctor referred him to psychiatrist Charles Devine, whose practice saw Mr. Little for the first time on September 7, 2011. *Danziger*, p.3. Dr. Devine diagnosed him with Attention Deficit Disorder (ADD) inattentive type and prescribed thirty (30) mg per day of the stimulant medication, Vyvanse. *Danziger*, p. 3.

Between September 7, 2011 and October 10, 2013 Mr. Little's Vyvanse dosage was increased from thirty (30) to seventy (70) mg per day, the maximum recommended dose. *Id*. at 3-4. In that same time period, Mr. Little complained of sleep problems and "feeling that his brain was not shutting off." *Id*. In January 2013, he was prescribed Zolpidem, a sedative used to treat insomnia. *Id*. at 3-4.

Between October 10, 2013 and May 3, 2017, Mr. Little took 70 mg of Vyvanse per day, as prescribed. *Id*. at 4. Throughout, Mr. Little reported insomnia and anxiety. *Id*. To counter the insomnia, Dr. Devine prescribed Restoril, a benzodiazepine and sleep aid, with marginal effect. Mr. Little drank alcohol every night and routinely consumed three or four drinks per night, in an apparent effort to self-medicate. *PSR*, ¶173.

Mr. Little's wife, Angela, recalls 2015 and 2016 as a series of "peaks and valleys." She recalls dramatic mood shifts, from intense irritability to isolation and withdrawal. *Danziger*, p. 8. He would stay up most of the night, hardly sleeping, spending time on the computer. *Id*. She later discovered that not only was he losing large amounts of money in the casino, but there were hundreds of day trading transactions. *Id*.

On May 3, 2017, Mr. Little met with Dr. Devine. *Id.* at p. 4. He reported doing well but felt the Vyvanse was too strong. *Id*. Mr. Little's Vyvanse dose was decreased from 70 mg, the maximum recommended dose, to 50 mg. *Id*. Within two weeks, Mr. Little was arrested on the instant matter.

After his arrest, Mr. Little continued to meet with Dr. Devine. There is a reference to anxiety. *Danziger*, p. 4. Dr. Devine prescribed Zyprexa, an antipsychotic with mood stabilizing properties. *Id*. Mr. Little reported the Zyprexa was helpful. *Id*.

On November 4, 2017, Dr. Devine authored a letter in which he wrote, ""I am convinced with a very high degree of medical certainty that he [Mr. Little] was misdiagnosed." *Letter from Dr. Charles Devine*, p. 1. Dr. Devine further wrote, "I am now of the firm belief that Mr. Little suffers from ADHD <u>and</u> Bipolar II Disorder." *Id*. at 1-2.

Dr. Devine bases this opinion on two primary factors: (1) Mr. Little's positive response to Zyprexa, a mood stabilizing agent, and (2) Mr. Little's history of insomnia, racing thoughts, and

irritability while taking Vyvanse for ADD. *Devine Letter*, pp. 2-3. Doctor Devine writes that bipolar II is a:

> condition characterized by low-level grandiosity, hyperenergy, hyperproductivity, racing thoughts, irritabilitiy, and a decreased need for sleep. Most importantly, these patients are at a very high risk of poor decision-making. People with this disorder make choices that they typically wouldn't make and take risks that they typically wouldn't take.

*Id.* at 2. If called, Dr. Devine would testify that, when treating patients for both bipolar disorder and ADD, the patient must first receive a mood-stabilizing agent. Once the patient's mood is regulated, the patient may be prescribed an amphetamine to treat ADD. If a bipolar patient is prescribed an amphetamine without a counterbalancing mood stabilizer then the amphetamine can wreak havoc. It can result in racing thoughts, insomnia, and irritability, all symptoms that Mr. Little described having.

In hindsight, Mr. Little's need for a sleep aid (like Restoril) and Mr. Little's self-medication with alcohol are further evidence that Mr. Little's Vyvanse prescription had increased the effects of his undiagnosed and untreated bipolar disorder. As Dr. Devine wrote, the Vyvanse created a "percolating evolution of symptom worsening" and "inadvertently put Mr. Little in a precarious position in terms of risk-taking, poor judgment, and impulsivity." *Id*. at 1.

On November 6, 2017, Mr. Little met with board certified forensic psychiatrist Dr. Jeffrey Danziger of Psychiatric Affiliates, P.A. in Maitland, Florida. *Danziger*. Dr. Danziger interviewed Mr. Little, spoke with Mr. Little's wife, reviewed Mr. Little's medical history, and provided a psychiatric evaluation of Mr. Little. *Danziger*. Based on his analysis, Dr. Danziger agrees that Mr. Little suffers from bipolar disorder. *Id*. at 9-11.

Additionally, Dr. Danziger believes the failure to diagnose bipolar disorder and simultaneously prescribe the maximum recommended dose of an amphetamine: "…worsened the

Bipolar Disorder, provoking (in my opinion) an increase in manic symptomatology, adversely impacting Mr. Little's judgment and reasoning." *Id.* at 11. In Dr. Danziger's opinion, "the misdiagnosis and treatment with amphetamines, which worsened Mr. Little's true underlying psychiatric disorder during the timeframe of the misconduct, and adversely impacted his judgment and behavior, represent factors that the Court may wish to consider in deciding Mr. Little's disposition." *Id.*

Undersigned counsel provided US Probation with a copy of Dr. Devine's letter and Dr. Danziger's expert report. Based in part of their opinions, US Probation recommended a downward variance. *PSR*, pp. 41-42.

*ii.*     *Nerve Damage*

Throughout the charged conspiracy, Mr. Little also suffered from nerve damage and chronic pain in his neck and right arm. *Danziger*, p. 2. In October 2011, he went to the hospital with "excruciating" pain in his arm. *PSR*, ¶164. He received a vertebrae fusion, but the "pain and symptoms of heaviness and numbness of the right arm…were never entirely alleviated by the surgery." *Id.* In 2015, Mr. Little underwent a second surgery, which improved his pain and related symptoms by 80-85%. *Id.* However, according to Mr. Little's wife, his pain was, and is, nearly constant. PSR, 158.

*iii.*     *Effects of Misdiagnosis, Medication, and Chronic Pain*

Mr. Little's behavior throughout the charged conspiracy provides evidence that his misdiagnosis, over medication, and chronic pain affected Mr. Little's judgment and recklessness. Such evidence is found in Mr. Little's trading records and his text messages with Andrew Berke.

a.    <u>Trading Records & Vyvanse 30 MG to 60 MG</u>

On September 7, 2011, Mr. Little was diagnosed with ADD and prescribed Vyvanse at 30 mg per day. Two weeks later, Mr. Little deposited $2,500 to his Fidelity trading account. *Gov't*

*Discovery*, Bates No. *USAO_SDNY_6695*. He had not deposited money to this account for four months. *Id*. at 6661, 6669, 6677, 6683.

Three weeks later, on September 28, 2011, Mr. Little's Vyvanse dosage was increased to 40 mg. That same day, Mr. Little deposited $500 to his Fidelity account. *Id*. at 6695. Two days later, he deposited $3,000 more. *Id*. By January 2012, he had deposited $15,100 more. *Id*. at 6699, 6705, 6715. Over that same four-month period, Mr. Little bought and sold a substantial number of shares in BioPharm Asia. After January 2012, Mr. Little did not deposit more money until after his Vyvanse dosage was increased again. *Id*. at 6721, 6729, 6733, 6741.

On April 26, 2012, Mr. Little's Vyvanse dosage was increased to 60 mg. Two weeks later, Mr. Little deposited $2,000 to his Fidelity account. *Id*. at 6741. On July 18, 19, and 23, he deposited $11,000, $5,000, and $9,000, respectively – some of the largest monthly deposits he'd made in at least a year and a half. *Id*. at 6751. With his July deposits, Mr. Little bought 1050 shares of "Proshares TR II Proshares Ultrashort" for $28,725.45. *Id*. In September and October 2012, Mr. Little sold a large portion of his ProShares investment at a short-term loss. *Id*. at 6757.

Additionally, in October 2012, Mr. Little sold a significant amount of his previously acquired BioPharm Asia stock for substantial long-term losses. *Id*. at 6775. At the beginning of October 2012, Mr. Little's trading account was worth $50,136.94; by the end it was worth $1,635.58[3]. *Id*. at 6773. After October 2012, Mr. Little effectively stopped trading for the next ten months. Dr. Devine had increased his Vyvanse dosage to 60 mg only six months prior.

### b. Vyvanse Prescription Increased to 70 MG

On October 10, 2013, Mr. Little's Vyvanse dosage was increased to 70 MG, the highest recommended dose. Prior to this increase, Mr. Little had effectuated three trades in October. *Id.*

---

[3] He withdrew $22,500 from his account.

at 6840. The next day, Mr. Little made five trades. *Id*. at 6840-6841. Over the rest of October, he effectuated multiple trades on his account.

Thereafter, Mr. Little's trading records are staggering. Over the next three months, he lost an incredible amount. In November, his trading account had a net negative change in investment value of $13,843.47, in January 2014 his trading account had a net negative change in investment value of $49,367.22, and in February 2014 his trading account had a net negative change in investment value of $10,356.89. *Id*. at 6847, 6871, 6881.

Unlike prior losses, Mr. Little did not withdraw his money or stop trading. He exhibited the reckless behavior and poor judgment of someone whose bipolar disorder was being driven by an unchecked amphetamine. He was on tilt. Over the next 23 months, between March 2014 and June 2016, Mr. Little's trading account had a net negative change in investment value in 17 separate months, including net negative changes of $121,829.89 and $65,824.79. This is consistent with Dr. Danziger's theory that Mr. Little was exhibiting periods of reckless behavior and hypomania throughout the charged conspiracy.

Additionally, this activity shows a direct correlation between Mr. Little's increased Vyvanse dose and an increase in reckless trading behavior. The Vyvanse was fueling the worst parts of his bipolar disorder, negatively affecting his judgment and reasoning and causing him to commit acts which harmed him and his family.

c. Drinking

Throughout the charged time period, Mr. Little's drinking increased, to the point that he was consuming 3-4 mixed drinks per night. *PSR*, ¶173. Mr. Little's wife, Angela, his mother-in-law, Carol, and his good friend, Eugene all describe a man whose drinking had worsened between 2014 and 2017. Eugene Son described instances where he had to forcibly take Mr. Little's keys

to keep him from driving. This behavior is consistent with someone who was improperly prescribed a stimulant and trying his best to self-medicate[4]. *Dr. Devine Letter*, p. 3.

        *iv.*     *Relevance*

Courts take a defendant's mental and physical disabilities into consideration when determining whether a variance is appropriate. *See*, e.g.*, United States v. Almenas*, 553 F.3d 27 (1st Cir. 2009) (affirming downward variance of 43 months below the bottom of the guideline range based on defendant's combination of physical and mental disabilities, including depression and chronic back and neck pain). *See also*, e.g. *United States v. Figueroa*, 421 Fed.Appx. 23, 25 (2nd Cir. 2011) (where Court granted defendant a substantial downward variance because of his "individual circumstances" and "physical condition", including health and life expectancy.")

In this matter, Mr. Little's undiagnosed bipolar disorder, increased symptomology because of his Vyvanse prescription, excessive drinking which requires rehabilitation, and his subsequent recklessness and poor judgment should weigh heavily in the Court's analysis.

### 2. __The Need for the Sentence Imposed__

    a.   <u>A-B. to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;</u>

The Court's need to incarcerate Mr. Little as a form of "just punishment" is substantially lessened by the devastation that Mr. Little has already suffered, and will continue to suffer, because of his arrest. The collateral consequences of his conviction have shaken his life, and the life of his family, to their foundation. These collateral consequences have, in effect, punished Mr. Little to such a degree that jail is not necessary to provide just punishment in this matter.

---

[4] Excessive drinking and an independent alcohol evaluation led Florida Lawyer's Association to accept Mr. Little into their Florida Bar-sponsored rehabilitation program.

First and foremost, Mr. Little has lost his career and livelihood. Over the course of 15 years, he painstakingly built his career and reputation as a lawyer. He laid the foundation for long-term growth and earnings that would have benefitted his family for, potentially, generations. Now, everything he built and worked so hard for is gone.

Furthermore, the collateral consequences on Mr. Little's family have been enormous. The Littles had to sell their house and move into an apartment. Mr. Little's daughter will likely have to leave her private school because the family can no longer afford it. This will have a detrimental direct impact on her because, throughout her father's case, her school has been one of the only things in her life that has not changed. But, more important, she receives special treatment and accommodations because of her struggles with ADHD.

Since the loss of Mr. Little's job and income, Mrs. Little has had to take on additional hours and work load in order to meet the family's debt and provide financially for them. Mr. Little has essentially taken on the roles of caregiver to their daughter and house husband. Were Mr. Little to go to jail, the Little would have no one to pick up and drop off their daughter, watch their daughter after school, or, most importantly, help her for the hours she requires to do her homework because of her ADHD. Their closest family lives across the state. If Mr. Little is incarcerated, given their current debt, the Littles are not in a position to afford comparable after school care. Furthermore, the impact of Mr. Little's incarceration on his ten-year old would be permanent and, potentially, irreversible.

As noted in the PSR, the Littles face enormous financial obligations. They face a tax burden of over $300,000, and growing. He faces an SEC case which could result in severe penalties. He also faces a criminal forfeiture of $452,998. The Littles' net worth is reported in the PSR as negative $473,137. *PSR*, p. 31.

Case law supports the loss of livelihood as justifying a downward variance. *See*, *e.g.* *United States v. Stewart*, 590 F.3d 93, 141 (2nd Cir. 2009) (where the Court granted a variance in part because Defendant would not be able to pursue a career as an academic and therefore the need to impose substantial punishment is mitigated because the conviction itself already visits substantial punishment on the defendant). *See also*, *United States v. Anderson*, 533 F.3d 623 (8th Cir. 2008) (insider trading case where the Defendant scored a 21 on the guidelines and where a downward variance was affirmed after conviction at trial based on "other ways in which the defendant had suffered atypical punishment such as the loss of his reputation and his company, the ongoing case against him from the Securities and Exchange Commission and the harm visited upon him as a result of the fact that his actions brought his wife and friend into the criminal justice system").

    b. <u>C. to provide adequate deterrence and protect the public from further crimes</u>

Mr. Little does not need to be incarcerated in order to deter him from further crimes. His felony conviction and loss of livelihood is sufficient to deter this type of conduct from happening again. The Rules Regulating the Florida Bar, and its members, are very clear: "…a determination or judgment of guilt of a member of The Florida Bar by a court of competent jurisdiction of any crime or offense that is a felony under the laws of such jurisdiction is cause for automatic suspension from the practice of law in Florida." *Rules Regulating the Florida Bar*, Rule 3-4.4. If he avoids permanent disbarment and, instead, is disbarred for five years or more, he will be precluded from practicing law until such time that: 1) his civil rights are restored, and 2) he successfully takes and passes the Florida Bar examination and passes the character and fitness investigation. This limits his ability to engage in this sort of behavior again.

Further, adequate deterrence has already been implemented as he is now on the proper medication and his bipolar is being treated. He has increased his visits with Dr. Devine from once

every three months to once every month. He has also joined a treatment program to help him manage his bipolar disorder, receive the proper medication, and ensure that he is never driven to the poor decision making he suffered from in the time of the instant conspiracy. Given all these pro-active steps, and his age, Mr. Little is a markedly low risk for recidivism. *See*, *e.g. United States v. Carmona-Rodriguez*, 2005 WL 840464, *4 (SDNY, 2005) (observing that those Defendants over the age of 40 exhibit lower rates of recidivism in comparison to younger defendants.")

Moreover, the Court should note that, in May 2017, prior to his arrest, Mr. Little was self-aware enough to tell his doctor that he believed his Vyvanse dosage was too high. This is proof that Mr. Little became aware that something was wrong and made corrective measures to try and stop it. Since his arrest, he has proactively sought the assistance of his medical professionals to make sure it does not happen again. This shows that incarceration is unnecessary to deter Mr. Little from performing any further crimes or protect the public.

Finally, subpart (a)(2)(B) requires the Court to consider the need to "afford adequate deterrence to criminal conduct" generally, and not solely with regard to Mr. Little's likelihood of reoffending. The fact that as a result of his conduct, Mr. Little has lost his career and reputation, suffered a felony conviction, destroyed his family financially and had his disgrace reported in local and national news sources is enough to deter any other individual from engaging in this conduct. *See*, *e.g. PSR*, ¶155 (where Angela Little informed US Probation that Mr. Little's photograph was included on the front page of the Tampa Business Journal.)

c. <u>D – to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner</u>

Sentencing Mr. Little to time served and a term of house arrest would be the most effective manner of continuing Mr. Little's corrective treatment and medical care, including his psychiatric treatment and his substance abuse counseling.

Mr. Little has joined Florida Lawyers Assistance, Inc. (FLA) to help him combat alcoholism and other mental health issues. FLA is a not for profit Florida corporation mandated by the Florida Bar to provide alcohol/drug evaluation, rehabilitation contracting, monitoring, and reporting services for the Florida Bar. *See, Walter C. Little Contract with FLA.* The program is meant to address his substance abuse and mental health problems.

To gain acceptance into FLA, Mr. Little met with a therapist, who assessed whether substance abuse treatment was appropriate for Mr. Little. Mr. Little was recommended for treatment through FLA and signed a contract/monitoring agreement which outlines the terms of his participation. The program is demanding. His continued participation with FLA is dependent on specific conditions, including:

1) Totally refrain from the use of all mood-altering substances, including alcohol…any test result which is positive for alcohol, unless otherwise explained, is deemed a violation;

2) Obtain treatment from a therapist and provide unlimited release of all information concerning health and participation in treatment to FLA;

3) Mr. Little's therapist must notify FLA immediately of any failure to comply with or progress in treatment and failure to appear for appointments, continue prescribed medications, or cooperate in the therapeutic process;

4) Accept a monitor, who monitors Mr. Little's performance under his contract, and with whom he must make at least one personal contact per month;

5) Actively participate in a 12-Step or other abstinence based self-help program to be approved by FLA. Participation should include, at a minimum, the following:

> (1) attendance at a minimum of 1-2 meetings per week;
> (2) enlisting the aid of a sponsor, mentor, or guide, and giving such individual permission to disclose appropriate information if requested by FLA;
> (3) securing and reading the literature endorsed by such program;
> (4) encouraging his spouse to attend a self-help program to promote his recovery;
> (5) attending open meetings with his spouse, if possible;

6) Actively participate in a program of recovering professionals, including attendance at not less than one attorney support and one facilitated support meeting per week;

7) Keep an accurate online record of 12-Step and FLA meetings and submit an acceptable monthly report to FLA;

8) Submit to, and pay for, random urine drug screens, as well as any other hair, blood, sweat, or other substance screening tests, at such frequency as may be deemed appropriate by FLA;

9) Participate in continuing private and/or group therapy as required by a monitor;

10) Attend the FLA Annual Workshop; and

11) Immediately notify his monitor in the event he: a) uses any mind-altering substance; b) has a grievance or complaint filed against him by or with the Florida Bar; c) or has been charged with or arrested for any criminal offense.

Mr. Little has every incentive to comply with these strict treatment parameters. FLA has the power to report to the bar and, if they do, Mr. Little's attempt to regain his law license, should he be given

that chance, would be harmed. Further, this Court could require as a condition of supervised release that Mr. Little comply with all terms and conditions of the FLA contract.

As a result of Mr. Little's increased medical visits and joining a rigorous substance abuse and mental health program, US Probation believes that Mr. Little "is committed to getting better, so that he will be able to live a law-abiding life in the future." *PSR*, p. 41.

Courts in the Second Circuit have recognized that a sentencing court may consider any pre-sentence rehabilitation that a defendant has demonstrated as well as the likelihood that probation rather than prison will facilitate a defendant's future rehabilitation. *See*, e.g., *United States v. Nesbeth*, 188 F.Supp.3d 179, 194 (EDNY 2016) (where the Court "added to the variance mix" the Defendant's efforts at rehabilitation" and noted the Defendant's strong work ethic and desire to be of service). *See also*, *United States v. K*, 160 F.Supp.2d 421, 442 (EDNY 2001) (*citing United States v. Maier*, 975 F.2d 944, 948 (2d Cir. 1992)).

### 3. The Kinds of Sentences Available

Mr. Little pled guilty to 18 USC § 371, which carries no minimum mandatory. It is a Class-D felony and the Defendant is eligible for a probated sentence with special conditions. *See*, *PSR* ¶197

### 4-5. The kinds of sentence and the sentencing range established by the guidelines and any pertinent sentencing commission policy statements

Mr. Little's guideline range is 37-46 months with US Probation recommending a downward variance to 24 months. The question currently before the Court is whether to adopt this variance and, indeed, provide an even greater variance as the defense requests[5].

---

[5] Ordinarily defendants suffering from drug or alcohol programs may qualify for the drug program within the Bureau of Prisons and upon successful completion of such programs earn up to twelve (12) months credit from their sentence. Given the circumstances, it is unlikely will qualify for admission into this program.

U.S. Sentencing Commission statistics from fiscal year 2016 show that, in the Second Circuit, 36.3% of all cases were sentenced below the Guideline Range without relying on a downward departure and, instead, relying on *Booker*, 18 U.S.C. 3553, or a combination of other factors. *US Sent'g Comm'n, 2016 Sourcebook of Federal Sentencing Statistics*. This is up from 34.3% in fiscal year 2014 and 31.3% in fiscal year 2011. *US Sent'g Comm'n, 2014 & 2011 Sourcebook of Federal Sentencing Statistics*. Additionally, statistics from fiscal year 2016 show that defendants from the Southern District of New York were sentenced below the guideline range in 47.9% of cases without relying on a downward departure and, instead, relying on *Booker*, 18 U.S.C. 3553, or a combination of other factors. *US Sent'g Comm'n*, 2016 Sourcebook of Federal Sentencing Statistics.

Below guideline sentences make sense in fraud cases. Empirical research regarding white collar offenders shows no difference between the deterrent effect of probation and that of imprisonment. David Weisburd Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes, 33 Criminology 587 (1995) ("there is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white collar offenders.") Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime, 8 Cardozo J. Conflict Resol. 421, 448-49 (2007).

Finally, as recognized by the Honorable John Gleeson of the Eastern District of New York, "in the trenches where fraud sentences are actually imposed, there is a more nuanced reality" than the Guidelines allow. The "fraud guideline, despite its excessive complexity, still does not account for many of the myriad factors that are properly considered in fashioning just sentences, and indeed no workable guideline could ever do so." Sentencing judges "know that a full consideration of the offense and the history and characteristics of the defendant…implicates offense and offender

characteristics that are too numerous and varied, and occur in too many different combinations, to be captured much less quantified in the Commission's Guidelines Manual." *United States v. Ovid*, 2010 WL 3940724, *1 (EDNY 2010).

### 6. The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct

Looking at the case in hand, a variance is warranted if only to avoid an unnecessarily disparate sentence between Mr. Little and Mr. Berke. Mr. Berke had specialized trading knowledge to best utilize the information he received, Mr. Berke made more money than Mr. Little[6], Mr. Berke did not lose that money through reckless trading[7], Mr. Berke has not lost his job and and livelihood and, instead, is indeed is likely to continue his life as it was before, including trading as he desires[8]. Unlike Mr. Little, Mr. Berke still has his home in Apollo Beach, Florida. While it is true that Mr. Berke cooperated with the government and deserves, under the rules, some credit for that, we should not overlook the fact that it is Berke who profited the most from this and Little who, regardless of sentence imposed by this Court, will suffer the most.

### 7. The need to provide restitution to any victims of the offense.

Restitution is not applicable in this case, although a substantial forfeiture judgment will further cripple the Littles financially. *PSR*, ¶203-204.

### CONCLUSION

For the reasons stated above, it is respectfully requested that the defendant Walter C. Little be sentenced to a term of supervised release that includes community service and other conditions that this Court finds appropriate.

---

[6] *See*, Complaint ¶9d.
[7] *See*, e.g., Gov't. Discovery Bates No. USAO_SDNY_1527, 1560, 1586, 1600, 1654, and 1668 for monthly, net positive changes in the value of Mr. Berke's investments held at Charles Schwab throughout 2015.
[8] Upon information and belief, based upon the discovery in this case, Mr. Berke was and remains a millionaire.

DATED: February 8, 2018

Respectfully submitted,

*/s/ Todd Foster*
TODD FOSTER
Florida Bar No.: 0325198
tfoster@tfosterlaw.com
MATTHIEU GODDEYNE
Florida Bar No.: 0122189
mgoddeyne@tfosterlaw.com
**TODD FOSTER LAW GROUP**
1881 W. Kennedy Blvd.
Tampa, FL 33606
Telephone: (813) 229-7373
*Attorneys for the Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I filed the foregoing with the Clerk of United States District Court, using the CM/ECF System on this 8th day of February, 2018, which will send electronic notice to AUSA Robert Allen and Caroline Judge Mehta.

/s/ Todd Foster
Todd Foster