

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

February 15, 2018

BY CM/ECF

Honorable Katherine Polk Failla
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

    Re:    *United States* v. *Walter "Chet" Little*, 17 Cr. 450 (KPF)

Dear Judge Failla:

    The Government respectfully submits this letter in connection with the sentencing of the above-captioned defendant, Walter "Chet" Little, which is scheduled to occur on February 22, 2018 at 3:00 p.m., and in response to the defendant's sentencing submission dated February 8, 2018 ("Def. Submission"). The parties have agreed that the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") range applicable to the defendant's conduct is 37 to 46 months' imprisonment. Probation agrees with this calculation. For the reasons set forth below, the Government respectfully submits that a sentence within that range is appropriate.

## BACKGROUND

### I.    The Offense Conduct

    The conduct at issue in this case is straightforward. Little worked as a real estate attorney at a national law firm ("Firm-1"). (Jan. 31, 2018 Final Presentence Report ("PSR") ¶ 13). He eventually became a partner at the firm. Despite being extremely privileged to be employed as a partner at a law firm, making hundreds of thousands of dollars, Little traded on inside information to supplement his already substantial income. Little also tipped information to a friend named Andrew Berke in exchange for a cut of Berke's profits. Little then created fake invoices to try to paper over the kickbacks he received in exchange for inside information. And when the scheme began to unravel, Little turned to lies: he told Berke to lie to the SEC when the SEC began investigating Berke's trading, and, after being fired from Firm-1 for insider trading, Little omitted that information when interviewing with and ultimately being hired by another national law firm.

### A. Little's Insider Trading Scheme

Little was employed at Firm-1 between 2005 and 2016, eventually become a partner. He was making the salary one would expect of a partner at a national law firm, and his wife was also working as a CPA at another law firm earning around $150,000 per year. (PSR ¶ 153). But it was not enough: for a period of at least around 18 months, Little used his position at Firm-1 to get access to material nonpublic information about Firm-1's clients. Little surfed Firm-1's document management system for information about things like upcoming earnings announcements and mergers. Armed with that information, he then bought and sold stocks and options in riskless trades, earning hundreds of thousands of dollars. (PSR ¶ 25).

In addition to trading on confidential information himself, Little also tipped the information to Berke so that Berke could trade on it as well. His motivation in doing so was not altruistic. After hooking Berke on several riskless trades, Little demanded a cut of Berke's profits. But both Little and Berke knew that large, unexplained transfers of money from Berke to Little would be overly suspicious. So Little created fake invoices that purported to bill Berke for legal services that were never actually performed. (*See* PSR ¶¶ 119-20). In other words, Little laundered money in order to make his insider-trading scheme more profitable and in order to try to hide his crimes from law enforcement.

Little placed the following of sets of trades on inside information:

- In February 2015, Little improperly read documents on Firm-1's document management system regarding Whiting Petroleum Co.'s then-unannounced 4Q 2014 earnings. Because those earnings were unfavorable, Little bought put options on Whiting's stock. The day after Whiting released its earnings, Little sold those options for thousands of dollars of profits. (PSR ¶¶ 90-96).

- Between February and July 2015, Little followed the progress of a potential merger involving a company called Magnetek. (PSR ¶¶ 46-48). Eventually, when the timing of the deal became more certain, Little bought and sold stock for tens of thousands of dollars of profit. (PSR ¶ 52).

- In March 2015, Little improperly accessed documents on Firm-1's document management system revealing that Whiting was going to issue more stock. This is a negative development, since it dilutes existing shareholders. Little accordingly bought put options in Whiting's stock, and, once the securities offering was announced, sold those options for over a hundred thousand dollars of profit. (PSR ¶¶ 97-105).

- In April 2015, Little read documents on Firm-1's document management system that contained secret information about Harley Davidson's upcoming earnings. These documents revealed that Harley Davidson's next set of earnings announcements would be unfavorable. Little accordingly bought put options in Harley Davidson's

stock and sold them the same day that Harley Davidson announced its earnings for tens of thousands of dollars of profit. (PSR ¶¶ 81-87).

- In July 2015, Little improperly accessed documents on Firm-1's document management system containing secret information about Whiting's then-unreleased Q2 2015 earnings. Since the earnings were unfavorable, Little bought put options in Whiting stock. The day after these earnings were announced, Little sold the options he had purchased for tens of thousands of dollars of profits. (PSR ¶¶ 106-111).

- In July 2015, Little read documents on Firm-1's document management system that contained secret information about Pentair's upcoming earnings, which would be unfavorable. Little then bought put options on the stock. Once Pentair's earnings were released a few days later, Little sold the options he had purchased for a profit. (PSR ¶¶ 63-67).

- In July 2015, Little read documents on Firm-1's document management system that contained secret information about a company called Oshkosh Corp.'s still-unannounced earnings. Since the unannounced earnings were unfavorable, Little bought put options on Oshkosh's stock and sold them for a profit once the earnings were released. (PSR ¶¶ 74-80).

- In July and August 2015, Little read Firm-1 documents that revealed Pentair's involvement in an acquisition. Little bought options for Pentair's stock and sold them for a profit once the acquisition was announced. (PSR ¶¶ 68-73).

- In July and August 2015, Little found documents on Firm-1's document management system that revealed that Douglas Dynamics' next earnings announcement would be favorable. (PSR ¶ 55). Little then bought Douglas Dynamics stock, knowing that it would soon appreciate, and, around a week later, sold his shares for thousands of dollars of profits. (PSR ¶¶ 53-60).

- In October 2015, Little improperly accessed documents on Firm-1's document management system that had information about Whiting's then-unannounced Q3 2015 earnings. Since the earnings were going to be unfavorable, Little bought put options in Whiting's stock. He then sold these options for a profit the day after Whiting announced its earnings. (PSR ¶¶ 112-16).

- In February 2016, Little read a series of documents on Firm-1's document management system that revealed to him that the stock of a company called Hanger was going to be delisted. Little then bought put options on Hanger stock and made tens of thousands of dollars when Hanger's stock dropped 81% after the delisting became public on or about February 29, 2016. (PSR ¶¶ 32-43).

In many of these instances, Little tipped Berke. Berke then paid Little by sending checks in satisfaction of fake legal invoices, which were sent as late as October 2016. (PSR ¶ 120).

Little also very clearly knew what he was doing was wrong—and did it anyway. First, in every instance, Little had no legitimate reason to be looking at the documents in question. Little did not do work for any of the aforementioned companies. (*See, e.g.*, PSR ¶ 33). And as a real estate attorney, Little had no reason to be looking at documents regarding securities filings, mergers, or corporate earnings. Second, Little was not unsophisticated or unaware of the law. To the contrary, he was a trained attorney who was educated in the law. He also signed annual certifications while at Firm-1 that included disclosures regarding insider trading. Indeed, Firm-1 had a specific "Policy on Material Nonpublic Information Relating to Companies And/Or Securities" that specifically stated that "no Firm partner, associate, or other employee shall (1) buy or sell securities when that person is in possession of material nonpublic information respecting the securities or the issuer or (2) disclose any such information to any other person." (PSR ¶ 28). This policy further warned that insider trading was a crime. Every year, Little certified that he understood and was in compliance with it. (PSR ¶ 30). Third, as already discussed, Little also took actions to hide his conduct that evidenced his consciousness of guilt, such as creating the fake legal invoices for Berke.

### B. Little is Fired from Firm-1 and Attempts to Cover up the Scheme

Little's trading eventually attracted regulatory scrutiny. At the request of regulators, representatives of Firm-1 interviewed Little about his trading. In preparing for that interview, representatives of Firm-1 learned that Little had improperly accessed numerous confidential Firm-1 documents containing material nonpublic information, including some of the documents referenced above. Members of Firm-1 asked Little why he was accessing documents for clients and matters that he had never worked on, and, in response, Little lied. He denied improperly accessing confidential Firm-1 documents, and, when confronted with records proving that his denials were false, said that he was accessing them to try to get templates and other useful documents for his real estate practice (which lacks any facial plausibility since documents about securities filings would not be helpful to a real estate attorney).

Firm-1 terminated Little. Shortly thereafter, Little was hired as a partner by another national law firm and given a salary of over $400,000 a year. Little either lied about why he had left Firm-1 or failed to disclose that he had been terminated for what appeared to be insider trading. Little also lied to Berke—his friend and co-conspirator—about his reason for switching firms, telling Berke that he had made the change because he was being paid more.

Berke, moreover, was also contacted by the SEC about some of his trading. Berke reached out to Little after he was contacted and asked what to do. Little told Berke to lie. He instructed Berke to find old analyst reports that could provide a retroactive justification for Berke's trades, even though neither of them had researched the trades in question and had instead relied on the material nonpublic information that Little had stolen from Firm-1.

## II. The Defendant's Guidelines Range

Little pled guilty on November 9, 2017 pursuant to a plea agreement with the Government. In the plea agreement, Little and the Government agreed that the Guidelines range applicable to Little's conduct was 37 to 46 months' imprisonment (the "Stipulated Guidelines Range"). Probation agrees with this calculation. Little also agreed to pay forfeiture of $452,998, which represents his profits on the illegal trades charged in the Indictment as well as the kickbacks he received from Berke. (PSR ¶ 8(j)).

## DISCUSSION

As the Court knows, a sentencing judge must begin the process of imposing sentence by calculating the applicable Guidelines range. *See United States* v. *Corsey*, 723 F.3d 366, 375 (2d Cir. 2013) ("Even in cases where courts depart or impose a non-Guidelines sentence, the Guidelines range sets an important benchmark against which to measure an appropriate sentence."); *United States* v. *Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006) ("Where the Sentencing Guidelines provide reasonable guidance, they are of considerable help to any judge in fashioning a sentence that is fair, just, and reasonable."). After calculating the applicable Guidelines range, a court may impose a sentence above or below the Guidelines range in order to meet the sentencing goals set forth in Section 3553(a) if "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into considering by the Sentencing Commission." U.S.S.G. § 3553(b)(1). The sentencing goals identified in Section 3553(a) include, among other things, promoting respect for the law, providing just punishment, and deterring criminal conduct. *See United States* v. *Park*, 758 F.3d 193, 197 (2d Cir. 2014) (citing 18 U.S.C. § 3553(a)(2)).[1]

Here, a sentence within the Stipulated Guidelines range of 37 to 46 months' imprisonment would be sufficient but not greater than necessary to accomplish the goals of sentencing. As discussed in greater detail below, the defendant's conduct, and in particular his role in the offense and subsequent efforts to conceal his conduct, demonstrates the need for a significant sentence of incarceration.

---

[1] The full set of factors outlined in Section 3553(a) are: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the four legitimate purposes of sentencing, namely the need (a) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," (b) "to afford adequate deterrence to criminal conduct," (c) "to protect the public from further crimes of the defendant," and (d) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;" (3) "the kinds of sentences available;" (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7).

I.  **The Defendant's Conduct Warrants a Significant Term of Imprisonment**

The nature of Little's conduct requires a significant sentence of imprisonment in order to reflect the seriousness of his crime, deter criminal conduct, and provide just punishment.

   A. **The Seriousness of the Offense**

To begin, the seriousness of Little's offense requires a significant term of imprisonment. The integrity of U.S. capital markets is critical to the overall functioning of the nation's economy. A fundamental purpose of the securities laws is to ensure fair dealing in those markets so as to protect the public's confidence in them. Insider trading threatens that confidence by making capital markets seem inaccessible and unfavorable to ordinary people. For this reason, Congress has passed multiple laws meant to deter and punish insider trading—laws that embody its determination that insider trading is a serious offense. As Congress explained when it passed the Insider Trading Sanctions Act of 1984, "Capital formation and our nation's economic growth and stability depend on investor confidence in the fairness and integrity of our capital markets. Insider trading threatens these markets by undermining the public's expectations of honest and fair securities markets where all participants play by the same rules." H.R. Rep. No. 98-355, at 2 (1984) (accompanying Pub. L. No. 98-376, 98 Stat. 1264).

The conduct at issue here, moreover, was particularly egregious in multiple ways. First, Little did not simply trade on the material nonpublic information that he stole from Firm-1 and its clients. Little also tipped that information to Berke so that Berke could place his own riskless, illegal trades. Thus, even though Little made less money than Berke in the scheme (Berke's trades were larger), Little is far more culpable. Without Little, Berke would not have committed his crimes. Second, Little was a lawyer. He accordingly occupied a position of trust and responsibility with respect to confidential client information entrusted to Firm-1. As an attorney, he was also particularly well situated to understand why what he was doing was wrong. Third, Little's trading was not a one-time mistake. It was calculated, considered, and extensive. Little traded on inside information for well over a year. There were numerous instances in which Little could have stopped, but instead the opposite occurred: each illegal trade emboldened him to make more and bigger trades. By the end of the scheme, Little was not only trading on inside information himself but was demanding illegal kickbacks from Berke—in essence farming out his insider trading to others to make it even more lucrative.

Finally, Little made efforts to conceal his conduct, including affirmative efforts to obstruct the SEC's inquiry. When Berke was called by the SEC, Little told him to lie to the Government. That conduct demonstrates a complete disregard for the law.

   B. **The Need for Deterrence and to Promote Respect for the Law**

A Guidelines sentence is also necessary to deter future crimes. Because insider trading schemes are both highly lucrative and difficult to detect, significant punishment is necessary to deter others from similar conduct. *See United States* v. *Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily

those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it."). Should Little receive a light sentence, lawyers and financial professionals may be emboldened to engage in similar crimes. Indeed, Little has asked for a sentence of 200 hours of community service for a crime in which he illegally made over $450,000. How many people would take the same risk if the downside to being caught was community service?

Further, a significant term of imprisonment is necessary to protect the public's confidence in the law and markets. The sentence that Little seeks would send a message that the rich and the privileged can act with impunity and disregard for the law. It would signal to the public that lawyers and financial professionals who are caught engaging in white collar crimes will only receive the lightest of punishments—whereas someone with none of Little's privileges who stole the same amount of money through less sophisticated means like credit-card theft or burglary would almost assuredly receive a lengthy term of imprisonment. This type of signal not only hinders deterrence of white-collar crimes, but degrades respect for the law and the idea that people will be treated fairly and equally by courts.

At bottom, a sentence within the Sentencing Guidelines range is warranted to deter criminal conduct by professionals like Little, to effectuate the purposes of the securities fraud laws, and to send an appropriate message that this type of fraud will not be tolerated.

## II.     Little's Request for a Sentence of Time Served Is Inappropriate

Little makes several arguments in favor of downward variance and, in particular, a sentence of community service. Little claims that he deserves a downward variance in light of (1) his family; (2) the effect his arrest has already had on him; (3) his having entered into drug and alcohol rehab; and (4) his undiagnosed bipolar disorder. None of these factors, however, is a sufficient basis for Little to escape punishment.

To begin, it is of course true that a sentence of incarceration would create difficulties for Little's family. But that is unfortunately true in the vast majority of cases in which a defendant is sentenced. It was the defendant who placed his family in this situation by choosing to engage in criminal conduct. Moreover, the Guidelines would have little meaning if having a child was by itself a basis for a variance. In any event, Little's family is better situated than most others to absorb the impact of his incarceration. Little's wife is employed and highly compensated, receiving around $150,000 a year. (PSR ¶ 153). The defendant reports "business income" of $5,000 a month. (PSR ¶ 188). It is unclear what this is since he does not report any current employment in his PSR. To the extent it is investment income, it would continue even after his incarceration. Thus, while the Littles have significant debts (mainly for unpaid taxes), they are significantly cash-positive and not in the dire straits Little's submission suggests.

Second, the economic impacts that the defendant identifies are simply not a basis for a downward variance. While the defendant will be disbarred, that is expected and appropriate. He should not be practicing law given his actions.

Little also points to the fact that he will face a "crippling tax burden . . . as a result of his termination from his former law firm." (Def Submission at 2). But the fact that Little has to pay taxes has nothing to do with his crime and is not a consequence of it. And there is no reason why Little should be rewarded for his failure to withhold money for taxes in an appropriate fashion. Little apparently chose not to withhold for his taxes in sufficient amounts and instead assumed that he would get a large bonus from Firm-1 at the end of 2016, which he would then use to pay his taxes. (*Id.* at 2 n.1 (noting that "As a partner, Mr. Little would have paid his taxes with a bonus that he received in 2016, but since he was terminated he did not get that bonus.")). He should not have assumed he would get a bonus, especially when he was violating Firm-1's policies and abusing his position at the firm to steal material nonpublic information, and obtained a position at new firm while concealing that he was fired from Firm-1 for this conduct. Further, the only reason his taxes are so large is that he and his wife made an incredible amount of money in 2016: $822,360. (PSR ¶ 190). The idea that Little should receive a downward variance for the taxes he has to pay on his almost million-dollar income in 2016, which funded investment properties and a Mercedes (PSR ¶ 189), is entirely devoid of merit.

Little also suggests that he may be responsible for additional fines incurred in a settlement with the SEC. (Def. Submission at 3). But it is premature to consider how his SEC case will be resolved at this point or what positions the parties will take in that case.

Third, Little points to the fact that he is currently receiving treatment for drug and alcohol abuse. But he joined this program just a month ago, on January 8, 2018. (PSR ¶ 176). The proximity of his joining this program to his sentence cannot be ignored. Little was arrested on May 11, 2017, but waited until after he had pled guilty and until just before his sentencing to seek treatment.

Fourth, Little claims that he should receive a downward variance because he had an undiagnosed mental-health disorder that, he says, was responsible for is actions. (*See, e.g.*, Def. Submission at 3). But the expert report he submits to justify this argument should be given little weight. It was prepared at the request of counsel and at the cost of several thousand dollars. These types of reports are not neutral and are commissioned to receive a particular answer. They are plainly biased. And while bipolar disorder can cause impulsiveness, Little's conduct was not the type of mistake that can be attributed to poor judgment during an episode of mania. He regularly traded on inside information for well over a year. His conduct was calculated, considered and deliberate—not impulsive. Further, the idea that Little's judgment was so compromised that he could not tell right from wrong (even after his legal training) lacks merit. If his judgment was as tainted as he now claims, he would never have been able to become a partner at two large, national law firms. He would not have been able to be continuously employed at Firm-1 for 11 years in an extremely demanding job.

At bottom, granting a downward variance would send an improper signal to others in Little's position: that there is only upside from taking the same actions as this defendant. That you can trade on inside information, make a half million dollars, and, if you are caught, face no real punishment. White collar criminals should not be treated differently from others defendants in this District. This Court should deny Little's request for a variance.

## **CONCLUSION**

      For the reasons set forth above, the Government respectfully submits that a sentence within the Guidelines range stipulated by the parties would be appropriate.

Respectfully submitted,

JOON H. KIM
Acting United States Attorney

By:      /s/
Robert Allen
Assistant United States Attorney
(212) 637-2216

cc: Todd Foster, Esq. (counsel for defendant)